**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HEXA BUILDERS, LLC AND 3043 WILLIAMSTOWN URBAN RENEWAL, LLC<br><br>Plaintiffs,<br><br>v.<br><br>MAYOR AND TOWNSHIP COUNCIL OF THE TOWNSHIP OF MONROE and PLANNING BOARD OF THE TOWNSHIP OF MONROE,<br><br>Defendants. | Case No.: 26-cv-08284-ESK-EAP<br><br>Jury Trial Demanded<br><br>CIVIL ACTION<br><br>**AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PRO. 15(a)(1)(B)** |

Plaintiffs, HEXA Builders, LLC and 3034 Williamstown Urban Renewal, LLC (collectively referred to as the "Plaintiff") by way of Amended Complaint pursuant to Fed. R. Civ. Pro. 15(a)(1)(B), says:

**PARTIES**

1. Plaintiff, HEXA Builders, LLC, is a New Jersey limited liability company, whose address is 502 Carnegie Center, Suite 105, Princeton, New Jersey 08540 ("Hexa").

2. Plaintiff, 3043 Williamstown Urban Renewal, LLC, is a New Jersey urban renewal entity, created pursuant the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 et esq., whose address is 502 Carnegie Center, Suite 105, Princeton, New Jersey 08540 ("Owner").

3. Defendant, Planning Board of the Township of Monroe, is a municipal planning board created pursuant to N.J.S.A. 40:55D-23, having a mailing address at 125 Virginia Street, Williamstown, New Jersey 08094 (the "Planning Board").

4. Defendant, Mayor and Township Council of the Township of Monroe is a municipal corporation having a mailing address at 125 Virginia Street, Williamstown, New Jersey 08094 (the "Township").

## JURISDICTION

5. Jurisdiction is appropriate under Rule 4:69-1, which authorizes the Law Division, Civil Part, of the Superior Court to review, hear and afford relief for actions designated as "In Lieu of Prerogative Writ."

6. Claims brought under 42 U.S.C. 1983 may also be brought in New Jersey State Court. Maisonet v. N.J. Dep't of Human Servs., Div. of Family Dev., 140 N.J. 214, 221 (1995).

7. Pursuant to N.J.S.A. 10:6-2(d), any party who has been deprived of the rights and privileges secured by the State or Federal Constitutions, or the laws of the United States or State of New Jersey may bring a cause of action under the New Jersey Civil Rights Act in the Superior Court of New Jersey.

## BACKGROUND

8. Owner owns property located at 3043 Black Horse Pike, Williamstown, New Jersey, also known as Block 8401, Lots 8, 9 and 10 on the official tax maps of the Township of Monroe in Gloucester County, New Jersey (the "Property").

9. Hexa is the contract purchaser of the Property and has obtained preliminary site plan approval from the Planning Board to construct two warehouses on the Property.

10. On April 8, 2026, Hexa filed an application for Amended Preliminary Site Plan approval to utilize one of the warehouses as a data center. See **Exhibits E-1 to Ex. E-10**.

*Rehabilitation Area and Redevelopment Area Designations and Redevelopment Plan Adoption*

11. Previously, by way of Resolution No.: 221-2019, adopted by the Township on September 23, 2019, the Township designated a certain area of the Township of Monroe known as the Commercial Corridor, as an area in need of rehabilitation pursuant to N.J.S.A. 40A:12A-14 ("Rehabilitation Area").

12. The Property is located within the Rehabilitation Area.

13. Pursuant to N.J.S.A. 40A:12A-7, on February 27, 2023, the Township adopted Ordinance O:04-2023, which adopted the Commercial Corridor Redevelopment Area: Hexa Builders Redevelopment Plan Non-Condemnation, dated November 15, 2022 ("2023 Redevelopment Plan Authorizing Warehouses on the Property"), which set forth zoning for the Property that superseded the underlying zoning for the Property. See **Exhibit A**.

14. The 2023 Redevelopment Plan Authorizing Warehouses on the Property permitted warehouse, storage and distribution facilities as permitted uses and also office space specific to warehouse operations, and also identified certain accessory uses which were permitted on the Property.

15. By way of Resolution R:118-2024, adopted by the Township on March 27, 2024, the Property was designated as a Non-Condemnation Redevelopment Area pursuant to N.J.S.A. 40A:12A-5 and N.J.S.A. 40A:12A-6.

16. The Township then adopted Ordinance O:02-2025 on March 12, 2025, which amended the 2023 Redevelopment Plan Authorizing Warehouses on the Property to add data centers as a permitted use on the Property, and to expand the permitted accessory uses (the 2023 Redevelopment Plan Authorizing Warehouses on the Property together with Ordinance O:02-2025 is referred to as the "2025 Redevelopment Plan Authorizing Data Centers on the Property"). See **Exhibit B.**

17. Again, the 2025 Redevelopment Plan Authorizing Data Centers on the Property superseded the underlying zoning for the Property.

18. About a year later, after the Township Governing Body and Planning Board declared data centers as permitted uses consistent with the Master Plan pursuant to the 2025

Redevelopment Plan Authorizing Data Centers on the Property, the Township Governing Body and Planning Board then declared that a ban on data center uses in every area of the Township was also consistent with the Master Plan; public opposition motivated the about-face, not principles of law or planning.

*Preliminary Site Plan Approval and Public Opposition*

19. On September 23, 2025, Hexa filed an application with the Planning Board for preliminary major site plan approval for the Property, seeking approval for two (2) warehouses on the Property: one consisting of 522,000 s.f. and the other consisting of 1,110,000 s.f. (the "Warehouse Application"). See **Exhibits C-1 to C-8**.

20. A public hearing on the Warehouse Application was held by the Planning Board on January 8, 2026, at which time a large number of individuals spoke against permitting data centers at the Property.

21. The Planning Board granted preliminary major site plan approval for the Warehouse Application at the January 8, 2026 meeting, and the approval was memorialized in Resolution #PB-10-26 which was adopted February 2, 2026. See **Exhibit P.**

22. On January 28, 2026, the Township adopted Resolution R:78-2026, which directed the Planning Board to prepare an amendment to the 2025 Redevelopment Plan Authorizing Data Centers on the Property to impose standards on the data center use. See **Exhibit Q**.

23. At the January 28, 2026 meeting, it was explained that R:78-2026 was prepared in response to the public concerns regarding data centers expressed at the January 8, 2026 Planning Board meeting. See **Exhibit H**.

24. The Planning Board prepared draft standards applicable to data centers and held a public discussion at its March 2, 2026 meeting for purposes of considering the proposed standards.

See **Exhibit I**.

25. The proposed standards addressed vibrations, heat and glare, fuel systems, emissions, lighting, water consumption, noise control, maximum dBA standards, air quality, utility capacity, and architectural features and viewshed impacts.

26. Hexa's professionals worked cooperatively with the Planning Board's professionals to develop appropriate standards and both Hexa and the Owner were ready, willing and able to abide by the proposed standards.

27. Again, members of the public appeared at the meeting and voiced opposition to data centers.

28. At the March 2, 2026 meeting, the Planning Board Solicitor advised that the preparation of the standards by the Planning Board for data centers is an attempt to "stay ahead of the curve" so that when a data center use is proposed at any location, the Township had standards to apply that would protect against noise, water, emissions, sound, etc.

29. The Mayor, who is also a Planning Board Member, also noted that regulations were intended to "place safeguards" in the 2025 Redevelopment Plan Authorizing Data Centers on the Property to protect the public and the residents.

30. The Planning Board then sent the proposed recommendations for data center standards to the Township for consideration.

31. On March 11, 2026, the Township Council held an Ordinance Committee meeting, at which time draft Ordinance O:19-2026, which sought to adopt the proposed standards for data centers recommended by the Planning Board, was considered. See **Exhibit R**.

32. At the March 11, 2026 regular Township Council meeting which immediately followed the Ordinance Committee meeting, draft Ordinance O:19-2026 adopting data center

standards, was originally listed on the Township Council agenda for introduction, but was pulled from the agenda by way of a Motion made at the March 11, 2026 Township Council meeting. See **Exhibit D**.

33. The public engaged in a social media campaign to put intense pressure on the Township to ban all data centers. See **Exhibit KK**.

*Data Center Ban*

34. At the March 25, 2026 Township Council meeting, the Township introduced Ordinance O:20-2026, which purported to repeal the 2025 Redevelopment Plan Authorizing Data Centers on the Property(which had added data centers as a permitted use) to specifically eliminate data centers as a permitted use ("2026 Redevelopment Plan Banning Data Centers on the Property"). See **Exhibit U**.

35. During the meeting, a statement was made by the Mayor that "we are here as elected officials, uh, this evening saying that we're going to do everything in our power to stop all datacenters from coming here."

36. Further, the Mayor stated that the Township intended to ban all data centers and the Township was going to direct the Planning Board and all of its officials to "deny any applications for that use" and to "block any data centers from coming until we can get an ordinance in place."

37. On April 8, 2026, the Township introduced Ordinance O:25-2026, which purports to ban data centers and any use resembling a data center from every zoning district in the Township of Monroe ("Ordinance Banning Data Centers Town-Wide"). See **Exhibit J**.

38. The Ordinance Banning Data Centers Town-Wide also states "[a]ny prior approval, including but not limited to zoning permits, site plan approvals, or redevelopment agreements, that has not resulted in the lawful establishment and operation of a use prior to the effective date of this

section shall not vest any right to establish a Data Center Use." See **Exhibit V**.

39. Another provision of the Ordinance Banning Data Centers Town-Wide makes it a violation of the Ordinance Banning Data Centers Town-Wide to "[e]stablish, construct, reconstruct, alter, expand or operate a Data Center" and also makes it a violation of the Ordinance Banning Data Centers Town-Wide to "[a]pply for, obtain, or act under any permit, approval, or authorization for a use that constitutes or is substantially similar to a Data Center…"

40. These provisions effectively prohibit and penalize any attempt to seek a use variance for a data center.

41. Even though violations and penalties for violations of the zoning code and land development ordinances are already set forth in Article XV of Chapter 175, Land Development, of the Township Code, the Ordinance Banning Data Centers Town-Wide sets forth a separate and distinct penalty and violation section for violations of the Ordinance Banning Data Centers Town-Wide as it relates to data centers.

42. Both the 2026 Redevelopment Plan Banning Data Centers on the Property and the Ordinance Banning Data Centers Town-Wide were adopted on second reading following a public hearing on April 22, 2026. See **Exhibit L.**

43. Notices of adoption for both 2026 Redevelopment Plan Banning Data Centers on the Property and the Ordinance Banning Data Centers Town-Wide were published on the Township's website on April 23, 2026.

44. Both the 2026 Redevelopment Plan Banning Data Centers on the Property and the Ordinance Banning Data Centers Town-Wide state that the ordinances "take effect twenty (20) days after final passage and publication as required by law."

45. As a result, the effective date for both the 2026 Redevelopment Plan Banning Data

Centers on the Property and the Ordinance Banning Data Centers Town-Wide is May 13, 2026.

*Data Center Application*

46. At the January 28, 2026 Council meeting, the Mayor acknowledged that Hexa had previously requested a data center use be included as a permitted use in addition to a warehouse use in order to effectively develop the Property and attract a tenant for the Property.

47. The Mayor stated at the March 2, 2026 Planning Board meeting that Hexa had not yet secured a tenant, that it was unclear what the use would be for the Property, and it would depend upon who Hexa attracted to that location.

48. Although the Township had intended to introduce Ordinance O:19-2026 on March 11, 2026, which would have created standards to apply to data centers, it did not and instead on March 26, 2026 introduced Ordinance O:20-2026, which would adopt the 2026 Redevelopment Plan Banning Data Centers on the Property.

49. On April 8, 2026, two weeks before the 2026 Redevelopment Plan Banning Data Centers on the Property was adopted, Hexa submitted an Application for amended preliminary site plan to the Planning Board, which proposed to change one of the proposed warehouses to a data center ("Data Center Application").

50. Under the original preliminary site plan approval, Hexa proposed two (2) warehouse structures on the Property, one consisting of 522,000 s.f. and the other consisting of 1,110,000 s.f. with 763 parking spaces 304 tractor trailer parking spaces and numerous stormwater basins ("Original Project.") See **Exhibit C-4**.

51. Under the Data Center Application, the Original Project was modified as follows: (1) the 1,100,000 s.f. building was reduced to a 1,000,000 s.f. building and was changed from a warehouse to a data center; (2) a portion of the parking area was converted to on-site electrical

infrastructure; (3) the total parking spaces were reduced from 763 spaces to 553 spaces; (4) the loading spaces were reduced from 304 spaces to 170 spaces; and (5) an updated stormwater management report was provided to demonstrate how the change in use to a data center did not impact the previous design, which acknowledged the Pinelands inconsistencies and addressed how the final revised report will address each inconsistency as well as the technical comments from the Planning Board Engineer and other outside agency review comments. See **Exhibit E-5**.

52. The location of the buildings, parking areas, and stormwater basins in the Data Center Application remain largely the same as was proposed in the Original Project.

53. Given the Inconsistent Certificate of Filing, the stormwater management plans had to be revised regardless to address the concerns of the Pinelands Commission.

54. The Township Code states the standard for determining completeness.

55. Section 175-61.A. (11) requires the Board to make a determination of completeness in accordance with Section 175-37.B, which requires the Board to certify whether an application is complete.

56. Section 175-37.D. of the Township Code sets forth the standard for making a completeness determination, which states, "[a]n application shall be considered complete when the plans, documents and supporting information submitted includes all items required in Chapter 175, Article X, in accordance with the standards in Article XIII and XIV. …"

57. Article X of the Township Code contains the standards for submissions for different types of applications, and Section 175-71 of Article X contains the standards for Preliminary Site Plan submission.

58. Importantly, when the Planning Board originally determined completeness for the Original Project, it utilized the standards set forth in Section 175-71.

59. In the November 18, 2025 review letter from Pamela J. Pellegrini, PPE, PP, CME of Colliers Engineering & Design, which was prepared for the Original Project, it was acknowledged that Section 175-71 is the standard for determining completeness:

> **3.0 Submission Requirements**
>
> **3.1** In accordance with §175-71, submission of the following information is required as part of an application for preliminary major site plan approval. Based upon our review of the submitted items, we have determined that this preliminary major site plan application is complete with all required items submitted."

See **Exhibit N.**

60. However, when reviewing the Data Center Application, the Planning Board applied Section 157-61 as the standard for determining completeness.

61. Importantly, the Data Center Application was an amended application, which amended the application for the Original Project, which had previously been deemed complete.

62. The Planning Board failed to consider the documents previously submitted and accepted by the Planning Board as part of the application for the Original Project.

63. Even though the Planning Board ordinarily does not hold public meetings to determine completeness, the Planning Board held a special meeting on May 12, 2026 to review completeness of the Data Center Application. See **Exhibit S**.

64. Prior to the public meeting, the Planning Board Planner and the Planning Board Engineer each submitted a review letter regarding their recommendations for completeness.

65. At the public hearing, the Planning Board Engineer added additional documents he wanted submitted that were not in the review letter or required by the Township Code.

66. At the Planning Board hearing, Hexa introduced evidence to show that the correct standard for a completeness determination was Section 175-71 of the Township Code.

67. Hexa also requested a waiver of any submission items that the Board sought to require.

68. The Planning Board determined at the May 12, 2026 meeting that the Data Center Application was not complete and adopted Resolution PB-27-26 memorializing its determination. See **Exhibit W**.

69. Even though Hexa requested submission waivers at the May 12, 2026 meeting, Resolution PB-27-26 of the Planning Board found that "[t]he Application included no requests for waivers from the Township's Submission Requirements."

70. Moreover, Resolution PB-27-26 of the Planning Board found that "Section 175-61 of the Ordinance provides the protocol for the Board's review of applications for Major Site Plan Review."

71. However, previously, in Resolution PB-10-26, adopted regarding the Original Project, the Board determined that the submission requirements contained in Article X were applicable.

72. Upon information and belief, the Planning Board regularly utilizes Section 175-71 for completeness determinations when preliminary site plan approval is sought.

73. In Resolution PB-27-26, the Planning Board incorporated within the Resolution the review letters from the Planning Board Engineer and the Planning Board Planner.

74. Resolution PB-27-26 did not recognize or acknowledge the documents that were previously submitted as part of the application for the Original Project, that the application for the Original Project has previously been deemed compete, or that the Data Center Application was an amended application to the application for the Original Project.

75. The Planning Board's actions and that of its professionals were in direct response to the mandate from the Mayor that the Planning Board and its professionals "block any data centers from coming until we can get an ordinance in place" and that if an application is filed for a data center to "flat-out deny" the application.

**COUNT ONE**

**EQUAL PROTECTION – 2026 REDEVELOPMENT PLAN BANNING DATA CENTERS ON THE PROPERTY**

76. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

77. "'The Fourteenth Amendment prohibits a state from "denying to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend XIV." Cty. Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 167 (3d Cir. 2006).

78. Article 1, Paragraph 1 of the New Jersey Constitution has been held to provide rights and protection analogous to the Fourteenth Amendment's equal protection rights. Secure Heritage, Inc. v. City of Cape May, 361 N.J. Super. 281, 299 (App. Div. 2003).

79. An equal protection claim can be sustained when a zoning ordinance treats similarly situated uses differently and there is no legitimate governmental purpose for the differential treatment. Cty. Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 171 (3d Cir. 2006) (stating a court must first determine if the use is similarly situated to other uses permitted as of right and if so, then the municipality must demonstrate "that the ordinance is rationally related to a legitimate government purpose").

80. A data center ban impacts a fundamental right, namely freedom of speech.

81. Laws which interfere with the fundamental right of freedom of speech require higher scrutiny. Regan v. Taxation with Representation, 461 U.S. 540, 547 (1983).

82. As the New Jersey Supreme Court explained long ago,

> But it is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority shall not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities; a substantial intrusion upon the right infringes essential individual liberties immune to legislative interference.

Katobimar Realty Co. v. Webster, 20 N.J. 114, 122 (1955).

83. "To be sure, it may be that an inquiry into whether something is 'similarly situated' will involve an inquiry into whether the two entities have the same impact." Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 139 (3d Cir. 2002).

84. A closed loop water system, self power generating data center use is substantially similar to the warehouse use in terms of water usage, energy grid usage, noise and vibrations, and is actually less impactful than warehouse usage in terms of traffic and trip generation.

85. In fact, when the Planning Board initially considered adoption of the 2025 Redevelopment Plan Authorizing Data Centers on the Property, the Planning Board Engineer testified that "I would have felt that maybe even a data center was already considered a permitted use as an industrial warehouse type use" but the 2025 Redevelopment Plan Authorizing Data Centers on the Property was intended to make it abundantly clear that data center use was permitted.

86. Storage use is permitted under the 2025 Redevelopment Plan Authorizing Data Centers on the Property and the 2026 Redevelopment Plan Banning Data Centers on the Property as a permitted use, as are warehouse and distribution uses.

87. A data center is similar to other warehouse and storage facilities, in that it stores digital data and digital communications for later use by others.

88. All warehouse uses and storage uses are similarly situated in all relevant aspects as a data center use because all of those uses will have a similar impact.

89. At the March 3, 2025 Planning Board meeting, it was recognized that data centers are similar to warehouses and other industrial uses "because they are storage in a different form or different format." See **Exhibit G**.

90. On March 2, 2026, the Monroe Township Planning Board fully considered a proposed amendment to the 2025 Redevelopment Plan Authorizing Data Centers on the Property prepared by Colliers, the Planning Board Engineer, that set forth detailed standards to address all of the public's concerns regarding the potential impacts of a data center.

91. At the March 2, 2026 meeting, the Planning Board Solicitor advised that the preparation of the standards by the Planning Board for data centers is an attempt to "stay ahead of the curve" so that when a data center use is proposed at any location, the Township had standards to apply that would protect against noise, water, emissions, sound, etc.

92. The Mayor also noted that regulations were intended to "place safeguards" in the 2025 Redevelopment Plan Authorizing Data Centers on the Property to protect the public and the residents.

93. For example, water consumption concerns were adequately addressed by requiring that all cooling systems be "closed loop configuration with no continuous groundwater withdrawal."

94. Closed loop configuration reduces water consumption by 70% to 90% over traditional evaporation cooled systems.

95. According to Applied Digital's website, its closed-loop cooling system "consumes around 22% less water than an average household, ensuring data enters can operate sustainably

without straining local water resources." See https://www.applieddigital.com/insights/why-modern-ai-data-centers-are-harnessing-the-power-of-liquid-cooling, last visited 5/18/2026.

96. The water consumption at a data center with a closed loop system would be less than or equal to the water consumption at a warehouse or storage use and would be less than or equal to the water consumption from the approved Warehouse Application.

97. The Township does not regulate other high water usage industries.

98. For example, according to the USDA, irrigation used in agriculture accounts for 47% of the total water withdrawal in the United States between 2010 and 2020.

99. Despite the high water usage, Monroe Township has multiple zoning districts in which agriculture is permitted. See Section 175-159 of the Township Code (Agricultural Production Zoning District) & Section 175-160 (Rural Development Zoning District). Agricultural use is also a permitted use in the RG-MU District, which is the underlying zoning district for the Property. See Section 175-161.3.B(1)(b).

100. Monroe Township has an existing noise ordinance at Chapter 213, and noise standards at Section 175-126.G, and all uses, including both data centers and warehouses, already have to comply with the noise ordinances.

101. N.J.A.C. 7:29-1.2(c)(1) and (2) set forth maximum noise levels of 65 dBa from 7:00 a.m. to 10:00 p.m. and 50 dBA from 10:00 p.m. to 7:00 a.m. for all uses.

102. As the Planning Board solicitor noted at the March 2, 2026 Planning Board meeting, noise levels of dBA is equal to the noise level from an office with chatter or at a busy restaurant.

103. Thus all uses, including data centers and their similarly situated warehouse uses and storage uses, would have to comply with these noise levels and would therefore have the same

impact.

104. Likewise, all uses, including both data centers and warehouses, already have to comply with performance standards set forth in Section 175-126, addressing glare, heat, radioactivity, vibrations, airborne emissions, and storage and waste disposal standards.

105. Air quality and visual impact would be the same, if not better with a data center than with a warehouse.

106. The architectural impact and shape of a data center and warehouse or storage facility would be the same.

107. The architectural plans for the Data Center Application show a building that is similar in size and appearance to the Warehouse Application that was approved at the Property. See **Exhibit C-7 & Exhibit E-9**.

108. At the May 12, 2026 Planning Board meeting, a member of the public indicated that warehouses have been converted to data centers.

109. In fact, just a few months before approving the ban, when the Planning Board considered adoption of the 2025 Redevelopment Plan Authorizing Data Centers on the Property, the Planning Board Engineer testified that a data center would be a less intense use than a warehouse use.

110. A data center use would have no greater impact on energy usage than a warehouse, storage facility or distribution facility.

111. Section 175-99 of the Township Code authorizes the Planning Board to consider "energy conservation techniques" when reviewing any application for development, which would include both warehouses and data centers.

112. Data centers that use fuel cell technology have significantly less impact on

communities than other uses because the use of fuel cell technology allows for “off-grid” electrical use which does not impact local resident utility bills.

113. Fuel cells comply with local air pollution standards and require a smaller footprint than traditional energy sources.

114. A data center does not have any greater impact on the community than any other permitted use currently allowed at the site, including agricultural use or warehouse use.

115. The only difference between warehouse use and data centers is that a warehouse use would produce more traffic than a data center use. See **Exhibit C-5 & Exhibit E-8**.

116. Prohibiting data centers altogether is unconstitutional because it treats similarly situated uses differently.

117. By imposing adequate regulations on data centers, the impact of data centers would be equal to or less than other permitted uses.

118. There is simply no legitimate governmental reason to treat a data center different than any other warehouse or storage facility because the uses are similarly situated and they will have substantially the same impact.

119. The only reason that data centers are being treated differently than the permitted warehouse, storage and distribution use is purely an animus by the public at large and a completely unsubstantiated fear that regulation alone could not adequately address the public’s concerns.

120. A zoning ordinance will fail when it is based on “bar animus towards a group or ‘fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding…” Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 135 (3d Cir. 2002).

121. The Township violated the equal protection clause of the U.S. Constitution by treating data centers different than similarly situated warehouses, storage facilities and distribution

centers without any legitimate governmental reason.

122. Because data centers could be regulated in the same manner as warehouse, storage and distribution facilities, which are permitted uses, there is no basis for different treatment in the form of a total municipal-wide ban of data centers.

123. The Township's decision to ban data centers as a permitted use is completely arbitrary and violates the Equal Protection doctrine of the Unites States Constitution and New Jersey Constitution.

124. The adoption of 2026 Redevelopment Plan Banning Data Centers is a policy of the Township because it was adopted by ordinance.

125. Adoption of 2026 Redevelopment Plan Banning Data Centers was based on invidious discrimination against data centers.

126. The 2026 Redevelopment Plan Banning Data Centers on the Property is therefore invalid and unenforceable.

127. Hexa has been damaged by the Township's actions.

**COUNT TWO**

**EQUAL PROTECTION - ORDINANCE BANNING DATA CENTERS TOWN-WIDE**

128. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

129. "'The Fourteenth Amendment prohibits a state from "denying to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend XIV." Cty. Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 167 (3d Cir. 2006).

130. Article 1, Paragraph 1 of the New Jersey Constitution has been held to provide rights and protection analogous to the Fourteenth Amendment's equal protection rights. Secure

Heritage, Inc. v. City of Cape May, 361 N.J. Super. 281, 299 (App. Div. 2003).

131. An equal protection claim can be sustained when a zoning ordinance treats similarly situated uses differently and there is no legitimate governmental purpose for the differential treatment. Cty. Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 171 (3d Cir. 2006) (stating a court must first determine if the use is similarly situated to other uses permitted as of right and if so, then the municipality must demonstrate "that the ordinance is rationally related to a legitimate government purpose").

132. The Ordinance Banning Data Centers Town-Wide violates the fundamental right of freedom of speech.

133. The data center use is substantially similar to the warehouse use and storage use, both of which are permitted uses within various zones of the Township.

134. For example, warehouse use and storage use are both permitted on the Property under both the 2025 Redevelopment Plan Authorizing Data Centers on the Property and the 2026 Redevelopment Plan Banning Data Centers on the Property, as both redevelopment plans constitute superseding zoning.

135. The warehouse proposed to be constructed under the Warehouse Application is similarly situated in terms of impact as a data center use would be on the Property.

136. In addition, wholesale distribution and warehouse facilities are conditional uses within the following zones: (a) within the Rural development zoning districts pursuant to Section 175-160.D.(2)(4); (b) within the RG-C Regional Growth Commercial District pursuant to Section 175-161.6.A(2)(d); (c) within the RD-C Rural Development Commercial District pursuant to Section 175-163.0.A(2)(e); and (d) within the C Commercial District pursuant to Section 175-163.D(1)(c)[2].

137. Wholesale distribution and warehouse facilities are permitted uses in the PB Planned Business District pursuant to Section 175-163.G.(2).

138. Light industrial uses, which include storage uses are permitted within Monroe Township as follows: (a) as a conditional use in the RG-C Regional Growth Commercial District pursuant to Section 175-161.6.A(2)(d); (b) RG-LI Regional Growth Light Industrial District; (c) PB Non-Residential Zone pursuant to Section 175-163.G.(2); and (d) within the RD-C Rural Development Commercial District pursuant to Section 175-163.0.A(2)(b).

139. A data center is similar to other warehouse and storage facilities, in that it stores digital data and digital communications for later use by others.

140. On March 2, 2026, the Monroe Township Planning Board fully considered detailed standards to address all of the public's concerns regarding the potential impacts of a data center.

141. Existing Township regulations already provide much of the standards that could be applied to data centers.

142. By imposing adequate regulations on data centers, the impact of data centers would be equal to or less than other permitted uses.

143. There is simply no legitimate governmental reason to ban data centers when no other similar uses are banned.

144. In addition, the Township has adopted Ordinance O:32-2026, which purports to regulate large scale industrial and commercial developments containing 200,000 s.f. or more. See **Exhibit M.**

145. Ordinance O:32-2026 identifies the same alleged negative impacts from these large scale uses as are purportedly from data centers: noise, traffic, thermal emissions, lighting, water consumption, air quality, energy consumption and impact to neighboring residential properties.

146. However, Ordinance O:32-2026, while purporting to regulate these uses, is a de facto ban, because the regulations were designed to ensure that no property can satisfy the criteria and the validity of Ordinance O:32-2026 is being challenged in a separate lawsuit.

147. The only reason that data centers were banned was purely an animus by the public at large and a completely unsubstantiated fear that regulation alone could not adequately address the public's concerns.

148. A zoning ordinance will fail when it is based on "bar animus towards a group or 'fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding…" Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 135 (3d Cir. 2002).

149. The Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) also violates the equal protection rights guaranteed under the State and United States constitutions because it includes a violation and penalty section that is different from the violation and penalty section applicable to other zoning violations.

150. Under the Township's Land Management Code, Article XV sets forth the provisions for violations and penalties of the zoning code.

151. Section 175-163.5.G. of the Ordinance Banning Data Centers Town-Wide sets forth an entirely separate and different penalty and violation section that is only applicable to data center uses and violations of Section 175-163.5.

152. There is no rational or reasonable basis to distinguish between a violation of the zoning code as it relates to data centers and a violation of the zoning code as it relates to any other use.

153. The Township violated the equal protection clause of the U.S. Constitution by treating data centers different than similarly situated uses without any legitimate governmental

reason.

154. Adoption of the Ordinance Banning Data Centers Town-Wide was based on invidious discrimination against data centers.

155. The public engaged in an intense pressure campaign to force the Township to ban data centers.

156. Public opposition was nothing more than "not in my backyard" response which is not a valid land use consideration.

157. Under the New Jersey Constitution, where the regulation exceeds the public need, it will violate the New Jersey Constitution. Gardner v. N.J. Pinelands Com., 593 A.2d. 251, 264 (N.J. 1991).

158. A total ban exceeds the public need because the public interest can be safeguarded with reasonable regulations.

159. A total ban on data centers is wholly irrational and arbitrary because other similarly situated uses are not wholly banned.

160. Where a government entity has imposed irrational and wholly arbitrary demands, it is sufficient to establish an equal protection violation. Willowbrook v. Olech, 528 U.S. 562, 565 (2000).

161. The Township's decision to ban data centers as a permitted use is completely arbitrary and violates the Equal Protection doctrine of the Unites States Constitution and New Jersey Constitution.

162. The Ordinance Banning Data Centers Town-Wide is therefore invalid and unenforceable.

163. Adoption of the Ordinance Banning Data Centers Town-Wide is a policy of the Township.

164. Hexa has been damaged by the Township's actions.

**COUNT THREE**

**EQUAL PROTECTION – COMPLETENESS DETERMINATION**

165. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

166. "'The Fourteenth Amendment prohibits a state from "denying to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend XIV." Cty. Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 167 (3d Cir. 2006).

167. Article 1, Paragraph 1 of the New Jersey Constitution has been held to provide rights and protection analogous to the Fourteenth Amendment's equal protection rights. Secure Heritage, Inc. v. City of Cape May, 361 N.J. Super. 281, 299 (App. Div. 2003).

168. An equal protection claim can be sustained when a zoning ordinance treats similarly situated uses differently and there is no legitimate governmental purpose for the differential treatment. Cty. Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 171 (3d Cir. 2006) (stating a court must first determine if the use is similarly situated to other uses permitted as of right and if so, then the municipality must demonstrate "that the ordinance is rationally related to a legitimate government purpose").

169. The Planning Board violated the equal protection doctrine by not following the same process, procedures and standards for determining completeness as it applied for all other preliminary site plan approvals.

170. When evaluating the application for the Original Project, the Planning Board utilized Section 175-71 as the standard for determining completeness.

171. In a March 26, 2025 review letter and again in a May 29, 2025 review letter, both from Colliers Engineering & Design, the Planning Board utilized Section 175-71 as the standard for determining completeness for an application for portion of an application for preliminary site plan review for a commercial project for Applicant Joseph Graber. See **Exhibit DD & Exhibit EE**.

172. For Applicant Sahara Sand Inc. t/a Sahara Sand of Franklin, Inc., an October 8, 2025 review letter and in an October 22, 2025 review letter, both from Colliers Engineering & Design, utilized Section 175-71 as the standard for determining completeness for an application for portion of an application for preliminary site plan review for a commercial project. See **Exhibit FF & GG.**

173. In a December 12, 2025 review letter from Colliers Engineering & Design, the Planning Board utilized Section 175-71 as the standard for determining completeness for an application for portion of an application for preliminary site plan review for a commercial project for Applicant Patriot Depot, LLC. See **Exhibit HH.**

174. For Applicant 1424 BHP Properties, LLC, who had submitted its application on March 25, 2026, the May 5, 2026 review letter and the May 28, 2026 review letter from Colliers Engineering & Design, the Planning Board utilized Section 175-71 as the standard for determining completeness for portion of the application for preliminary major site plan approval. See **Exhibit II & JJ.**

175. Importantly, for Applicant 1424 BHP Properties, LLC, the May 28, 2026 review letter from Colliers Engineering & Design acknowledged that despite a change in use, where the

site plan did not propose more than 5,000 s.f. of disturbance, no Certificate of Filing from the Pinelands was required.

176. The Planning Board intentionally treated the Data Center Application differently than all of the other applications for preliminary site plan approval by applying a different standard for determining completeness.

177. The Planning Board was not entitled to treat the Data Center Application differently than other applications for preliminary site plan when determining completeness.

178. The Planning Board intentionally treated the Data Center Application differently than other applications for preliminary site plan approval in the Pinelands for purposes of determining when a Certificate of Filing was needed.

179. Hexa has obtained an Inconsistent Certificate of Filing for a commercial structure from the Pinelands and such Inconsistent Certificate of Filing was not specific to warehouse use. See **Exhibit O.**

180. Even though the Planning Board previously found in other applications that the definition of development was not met for purposes of trigging a Certificate of Filing when there was a change in use with disturbance of less than 5,000 s.f., the Planning Board refused to apply the same standard to the Data Center Application.

181. Under the Rules of the Pinelands Commission, N.J.A.C. 7:50-4.1(a)(23) provides that a "change from one nonresidential use to another nonresidential use" is not considered development if the use will be served by public sewers and no additional development is proposed."

182. No additional disturbance was proposed between the Warehouse Application and the Data Center Application because the footprint of one of the buildings was smaller and the

utility infrastructure was proposed on the impervious coverage area that was previously identified for parking.

183. N.J.S.A. 7:50:4.1(a)(8)(i) provides that the construction of accessory structures are not considered development if the accessory structure is located in an area with existing impervious coverage and will not generate wastewater or will be served by sewer.

184. The on-site electrical structures were accessory structures under the Redevelopment Plan Amendment Permitting Data Centers, would not generate wastewater, and were located in the portion of the parking area that was considered an impervious surface.

185. The Planning Board is obligated to utilize the same standard for determining completeness for all preliminary site plan applications.

186. There is no legitimate governmental purpose for treating applications for preliminary site plan differently when evaluating the applications for completeness.

187. "[O]ne of the purposes for the enactment of the MLUL was the Legislature's intention to create 'statewide uniformity of process and practices in the areas of zoning and land use.'" Northgate Condo. Ass'n v. Borough of Hillsdale Planning Bd., 214 N.J. 120, 137 (2013).

188. The decision to treat the Data Center Application different from all other applications for preliminary site plan approval when determining completeness violates the Equal Protection Clause.

189. Also, when reviewing completeness for the application for the Original Project, Section 5.2 of the Collier's November 18, 2025 letter stated, "[a]n environmental assessment has not been provided, however, the application was submitted to the Pinelands and therefore, the Certificate of Filing takes precedent (sic) for the subject property."

190. If the Certificate of Filing with the Pinelands Commission takes precedent for the Property when the application for a preliminary site plan involves a warehouse, then it necessarily must take precedence for the Property for all preliminary site plan applications filed for the Property.

191. There is no legitimate governmental purpose for treating the applications differently.

192. Both data centers and warehouses are permitted uses under the 2025 Redevelopment Plan Authorizing Data Centers on the Property.

193. An application to the Pinelands Commission is required regardless of the use of the Property.

194. The Pinelands Commission reviewed and approved both the 2023 Redevelopment Plan Authorizing Warehouses on the Property, and the 2025 Redevelopment Plan Authorizing Data Centers on the Property.

195. When reviewing the 2025 Redevelopment Plan Authorizing Data Centers on the Property, the Pinelands Commission found that: "[t]he ordinance amends the redevelopment plan to permit data centers and office space specific to data center operations as principle uses. The ordinance also permits the following accessory use: fire suppression systems, electrical infrastructure, cooling systems, network infrastructure, and emission control systems" and that "Ordinance O:02-2025 does relate to certain CMP standards. However, I have determined that the ordinance raises no substantial issues with respect to these CMP standards."

196. Likewise, the Data Center Application is nothing more than an amendment of the application for the Original Project, which application was deemed complete.

197. Hexa is entitled to rely upon the documents previously submitted and determined

sufficient for purposes of completeness that were submitted in the application for the Original Project.

198. Given that one of the purposes of the MLUL is uniformity in process and procedure in land use applications, there can be no legitimate governmental interest to treat preliminary site plan applications differently for purposes of completeness determinations.

199. There is no legitimate governmental interest to treat completeness determinations differently for the same applicant and the same property.

200. Ordinarily, collateral estoppel would foreclose the opportunity to change positions on an issue in an administrative proceeding when: (a) the issue was identical to an issue decided in a prior proceeding; (b) the issue was fully litigated in the prior proceeding; (c) a final decision was issued in the prior proceeding; (d) the decision on the issue was essential to the final decision in the prior proceeding; (e) and the prior proceeding involved the same parties. In re Estate of Dawson, 136 N.J. 1, 20 (1994).

201. Likewise, equitable estoppel applies when a party has engaged in conduct intended to or reasonably likely to induce reliance and a party acts in reliance on the position that was originally taken. Matter of Borough of Englewood Cliffs, 473 N.J. Super. 189, 202 (App. Div. 2022).

202. There can be no legitimate governmental interest in treating the applications filed by Hexa for the same property in a different manner when the Planning Board has already determined the standard applicable for determining completeness and Hexa submitted its application in reliance upon that standard.

203. The only reason that the Planning Board treated the Data Center Application differently is because the Mayor directed the Planning Board to do so.

204. The Mayor at the March 25, 2026 Township Council Meeting, stated that the Planning Board and its professionals were directed to "block any data centers from coming until we can get an ordinance in place" and that if an application is filed for a data center to "flat-out deny" the application. See **Exhibit T**.

205. The statements of the Mayor at the March 25, 2026 directing the Planning Board and its professionals to block data centers and deny all data center applications constitute a policy of a decision-maker of the Township.

206. The Planning Board's decision to change the standard applicable for determining completeness solely as to Hexa's Data Center Application was a policy of a decision-maker.

207. Both the Township and the Planning Board are liable for the Planning Board's disparate treatment of the Data Center Application.

208. The Planning Board's decision to apply Section 175-61 as the completeness standard instead of applying Section 175-71 as it has done repeatedly in the past was intentional and arbitrary discrimination.

209. """[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.""" Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

210. The Planning Board's conduct in determining completeness for the Data Center Application violated the Equal Protection Clause and is therefore unconstitutional.

211. The Planning Board's completeness determination is invalid and must be overturned.

212. Hexa has been damaged by the Planning Board's and the Township's actions.

**COUNT FOUR**

**VIOLATION OF FIRST AMENDMENT - ORDINANCE BANNING DATA CENTERS TOWN-WIDE**

213. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

214. The First Amendment of the United States Constitution prohibits Congress from making laws "abridging the freedom of speech…"

215. Likewise, the New Jersey Constitution prohibits the adoption of any laws that "restrain or abridge the liberty of speech…" N.J. Const., Art. I, Para. 6.

216. Recently, the New Jersey Supreme Court held that """[b]ecause our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide the Court's analysis.""" Kratovil v. City of New Brunswick, 261 N.J. 1, 16 (2025).

217. "The First Amendment requires that there be sufficient justification for the exclusion of a broad category of protected expression as one of the permitted commercial uses in the Borough." Schad v. Mount Ephraim, 452 U.S. 61, 67 (1981).

218. When a zoning ordinance infringes on First Amendment rights, the regulation must be "narrowly drawn" and must "further a sufficiently substantial government interest…" Schad v. Mount Ephraim, 452 U.S. 61, 68-69 (1981).

219. New Jersey cases have agreed, stating that where a zoning ordinance encroaches on freedom of speech, especially where it would apply to both commercial and noncommercial speech, "the burden of overcoming the charge of constitutional invalidity is particularly strenuous." Bell v. Stafford, 110 N.J. 384, 395-96 (1988).

220. Where a regulation has a "disproportionate burden" upon protected speech or expression, and the regulated activity contains both speech and non-speech components, the government must provide a sufficiently important interest to justify the burden. Arcara v. Cloud Books, Inc., 478 U.S. 697, 702-704 (1986).

221. The Ordinance Banning Data Centers Town-Wide impacts both speech and non-speech conduct in the siting of the data center because the data center is the medium upon which electronic speech in the form of artificial intelligence is created and transmitted.

222. Artificial intelligence is a unique and wholly new medium of human communication and expression because it allows humans to use off-site computers and the internet to create expressive content and to communicate with one another.

223. Courts have been hesitant to uphold restrictions that prohibit an entire medium of communication because such prohibitions would unduly burden speech and expression. City of Ladue v. Gilleo, 512 U.S. 43, 55 (1994).

224. Merely asserting that the speech or expression can occur elsewhere does not prevent the law from violating the First Amendment. Reno v. ACLU, 521 U.S. 844, 880 (1997).

225. Outright bans of activities that impact freedom of speech have been regularly overturned.

226. A total municipal-wide ban on billboards was determined to be unconstitutional because there are less restrictive means to achieve the governmental interest. Bell v. Stafford, 110 N.J. 384, 396-97 (1988).

227. Where the activity is such that it can be regulated, then a municipal ban has been held to be unconstitutional. State v. Calabria, Gillette Liquors, 301 N.J. Super. 96, 107 & 108 (Law Div. 1997).

228. The Courts have held a variety of activities impact or implicate freedom of speech.

229. For example, nude dancing has been held to be a type of "expressive conduct" that is within the First Amendment's protection. City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000).

230. When the restriction impacts the medium of communication, Courts have held that the restriction impacts the First Amendment.

231. Billboards are considered "a medium of communication, and any regulation of that medium may not transgress the United States Constitution or the Constitution of this State." E & J Equities, Ltd. Liab. Co. v. Bd. of Adj. of the Tp. of Franklin, 226 N.J. 549, 556-57 (2016).

232. "Satellite communication facilities, like billboards and signs, are a medium of communication and thus the use of such facilities implicates First Amendment interests." L.I.M.A. Partners v. Northvale, 219 N.J. Super. 512, 524 (App. Div. 1987).

233. The Courts have explained that "the content of satellite-delivered telecommunications includes not only entertainment programming, but also valuable commercial, political, and social information. Any state or local regulation that may potentially restrict the access or use of a mode of communication which conveys or receives such information raises the issue of the constitutionality of such regulation in light of the Constitution's First Amendment guarantee of protection of free speech." Alsar Tech., Inc. v. Zoning Bd. of Adj.of Town of Nutley, 235 N.J. Super. 471, 484 (Law Div. 1989).

234. The First Amendment's protections also extend to new and emerging communication technologies.

235. The Courts have recognized that the First Amendment also applies to the internet and recognized that application of existing First Amendment doctrines are appropriate for new and emerging technologies. B.L. v. Mahanoy Area Sch. Dist., 964 F.3d 170, 179 (3d Cir. 2020).

236. Recently, the U.S. Supreme Court has said, "'[o]ur prior decisions have voiced particular concern with laws that foreclose an entire medium of expression.'" TikTok Inc. v. Garland, 604 U.S. 56, 69 (2025).

237. Under both the New Jersey and United States laws, data centers are a mode of electronic communication.

238. For example, in N.J.S.A. 2C:1-14(q) "Communication" is defined to mean "any form of communication made by any means, including, but not limited to, any verbal or written communication, **communications conveyed by any electronic communication device**, which includes but is not limited to, a wire, radio, electromagnetic, photoelectric or photo-optical system, telephone, including a cordless, cellular or digital telephone, **computer**, video recorder, fax machine, pager, or any other means of transmitting voice or data and communications made by sign or gesture." (Emphasis added).

239. Likewise, N.J.S.A. 2A:156A-2(m) defines "electronic communication" to mean "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric or photo-optical system that affects interstate, intrastate or foreign commerce…"

240. "Electronic communication system" is defined as "any wire, radio, electromagnetic, photo-optical or photoelectronic facilities for the transmission of electronic communications, and **any computer facilities or related electronic equipment for the electronic storage of such communications**…" N.J.S.A. 2A:156A-2(o) (emphasis added).

241. "Electronic storage" includes "[a]ny storage of such [electronic] communication by an electronic communication service for purpose of backup protection of the communication…" N.J.S.A. 2A:156A-2(q)(2).

242. Similarly, 18 U.S.C. §2510(14) defines "electronic communication systems" as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications…"

243. "Electronic storage" is defined as "any storage of such communication by an electronic communication service for purposes of backup protection of such communication…" 18 U.S.C. §2510(17).

244. The manner in which the Ordinance Banning Data Centers Town-Wide defines "data center" indicates that it impacts digital communication.

245. "Data Center" is defined in the Ordinance Banning Data Centers Town-Wide as including telecommunication systems, network systems and internet-related services.

246. Data Centers are critical to hold the infrastructure necessary for artificial intelligence ("AI") processing and cloud storage.

247. ChatGPT and similar programs allow for digital communication with a person and a computer server to ask and answer questions posed to it, making programs like Chat GPT a form of communication itself.

248. Data centers are used in sending email and text messages, using social media, storing data to be retrieved from internet based searches, and much more.

249. Data centers and the computers contained therein are a medium of communication and expression, as the provide the tools and equipment necessary for people to engage in generative AI, cloud based storage, which transmit emails, social medial, news sources, image, sounds, pictures and videos back to end users based on prompts, requests and/or requests.

250. Generative AI uses algorithms which contain editorial discretion as to how sources of data are selected and presented to the end user based on sources that the creator deems trustworthy.

251. New speech and content can be created through Generative AI's summary features, which allows Generative AI to take large amounts of written word and/or data and create its own version of what that documents, data and sources say.

252. The creation of summaries necessarily require discretionary decisions as to what particular information is important enough to include within the summary.

253. The U.S. Supreme Court has expressed that "many of the biggest platforms are beginning to use AI algorithms to help them moderate content. And when AI algorithms make a decision, 'even the researchers and programmers creating them don't really understand why the models they have built make the decisions they make.' Are such decisions equally expressive as the decisions made by humans? Should we at least think about this?" Moody v. NetChoice, LLC, 603 U.S. 707, 756 (2024) (Barrett concurring).

254. Generative AI allows end users to create content based on the sources of information and algorithms within the program to create its own expressive content, such as photographs, videos, music, art, conversation, stories, advertisements and problem solving.

255. Future use of AI could impact even more forms of communication, and a data center, at its very core involves computers literally communicating with each other.

256. Generative IA can be used in commerce to help answer questions and recommend beneficial products, and to create advertising material for products.

257. It can be used in the arts, music and entertainment industry to help create new entertainment experiences, create new and original stories, games, music, art, videos, pictures,

sounds or ideas.

258. In fact, the public objectors at the March 25, 2026 meeting actually used Chat GPT and other AI programs to create content to use in their objection to the Ordinances. (123:23-124:14).

259. People are using Generative AI to draft documents, such as letters or emails or stories, and even legal pleadings and legal briefs. See Fletcher v. Experian Info. Sols., Inc., 168 F.4th 231, 235 (5th Cir. 2026) (discussing a lawyer's use of AI to create legal briefs).

260. AI is even being used in the formulation of political advertisements and the creation of governmental records.

261. Banning a medium that allows for more efficient and effective political speech violates the First Amendment because it has a disproportionate burden on protected speech and expression.

262. The use of AI to create political advertisements and to generate political communication is becoming so pervasive that many states are adopting laws to regulate the use of AI in such political advertising and political speech.

263. According to the National Conference of State Legislatures, as of June 23, 2026, laws regulating the use of AI in campaigns and elections have been adopted by thirty-one (31) states. https://www.ncsl.org/elections-and-campaigns/artificial-intelligence-ai-in-elections-and-campaigns.

264. New Jersey currently has a bill pending at A4729, purporting to regulate the use of AI chatbots in providing election related materials.

265. "The First Amendment's protection of free speech has its 'fullest and most urgent application precisely to the conduct of campaigns for political office.'" Nat'l Republican

Senatorial Comm. V. FEC, 146 S.Ct. 2404, 2415 (2026).

266. Courts have also recognized that data compilation and storage involves a significant amount of speech.

267. Data centers allow access to vast amounts of published works and public records, including political and governmental records.

268. "'Data collected from consumers, compiled for commercial interests, and designed to be sold for the purpose of advertising . . . constitutes commercial speech." Consumer Data Indus. Ass'n v. Platkin, Civil Action No. 19-19054 (GC) (TJB), 2024 U.S. Dist. LEXIS 54812, at *55 (D.N.J. Mar. 27, 2024).

269. Courts have also said that, "[t]oday's digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties. We will soon have no choice but to address how our legal doctrines apply to highly concentrated, privately owned information infrastructure such as digital platforms." Biden v. Knight First Amendment Inst. at Columbia Univ., 141 S. Ct. 1220, 1221 (2021).

270. Government reports have also recognized the importance of data centers as critical infrastructure.

271. The U.S. Congress has announced in a publication on February 5, 2025 that "[d]ata centers are the primary means to house much of this IT backbone. Internet-based remote computing services (i.e., *cloud computing*) enable AI developers and users to access computing resources hosted in geographically distributed data centers. Not only may AI innovation and competition hinge on the availability of and access to advanced, secure, and sustainable computing resources, but such IT infrastructure may also be deemed 'a strategic national asset.'"

https://www.congress.gov/crs-product/IF12899, last visited 5/22/2026.

272. On January 14, 2025, former President, Joseph R. Biden, Jr. issued Executive Order 14141, which stated it was the policy of the United States to enable development of data centers subject to certain principles designed to protect the public. https://www.presidency.ucsb.edu/documents/executive-order-14141-advancing-united-states-leadership-artificial-intelligence, last visited 5/22/2026.

273. Executive Order 14141 also recognized the importance of "preventing the United States from becoming dependent on other countries' infrastructure to develop and operate powerful AI tools." https://www.presidency.ucsb.edu/documents/executive-order-14141-advancing-united-states-leadership-artificial-intelligence, last visited 5/22/2026.

274. Similarly, on January 23, 2025, current President, Donald Trump, issued a similar Executive Order indicating plans to "lead on critical manufacturing processes and technologies that are essential to national security, economic prosperity, and scientific leadership", including development of data centers. https://www.whitehouse.gov/presidential-actions/2025/07/accelerating-federal-permitting-of-data-center-infrastructure/, last visited 5/22/2026.

275. New Jersey has specifically recognized the importance of data centers and has created a program to award tax credits to AI data centers. See N.J.S.A. 34:1B-394 to N.J.S.A. 34:1B-402.

276. In a recent press conference, Governor Mikie Sherrill rejected the need for a total ban on data centers because she believes that New Jersey could balance the need for data centers with environmental and energy consumption/affordability concerns.

277. A total ban on data centers violates the First Amendment of the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution.

278. Data centers are a medium of expression and banning data centers would impose a significant burden on the free speech rights of all citizens in the United States.

279. A complete ban on data centers will overly burden, and in some instances, completely prevent the use of AI and cloud-based applications, and will prevent the entire form of medium.

280. As the use of Generative AI applications, the need for more data centers to support the use of these applications will increase.

281. Generative AI is a new and emerging type of speech that is more effective and efficient that other types of speech and expression because it allows the user to create speech and expressive content more quickly that other forms of speech.

282. There are not other adequate substitutes for Generative AI speech.

283. A complete ban on data centers, as opposed to regulation of the same, will make it more difficult, if not impossible for the public to access and use of AI in their daily lives.

284. "When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." McCullen v. Coakley, 573 U.S. 464, 497 (2014).

285. When a content-neutral law burdens speech and expression, such laws must be "narrowly tailored" and "must not 'burden substantially more speech than necessary to further the government's legitimate interests.'" McCullen v. Coakley, 573 U.S. 464, 486 (2014).

286. Where a governmental interest can be addressed through other alternatives that leave open the medium of speech or expression, the regulation that bans the medium of speech and

expression will violate the First Amendment. McCullen v. Coakley, 573 U.S. 464, 489 (2014).

287. A total ban is not narrowly tailored because there are adequate safeguards and regulations that could be imposed to mitigate any potential adverse impacts.

288. In fact, the Township prepared those regulations and was intending to adopt appropriate regulations in March of 2026.

289. Because there is a less burdensome manner to address the Township's concerns regarding the impact of data centers that still allows the use of that medium, the Ordinance Banning Data Centers Town-Wide violates the First Amendment.

290. The Ordinance Banning Data Centers Town-Wide violates the New Jersey and United States Constitutions and therefore is unconstitutional.

291. The Ordinance Banning Data Centers Town-Wide is therefore invalid and unenforceable.

## COUNT FIVE

## VIOLATION OF CONSTITUTIONAL ZONING POWER - ORDINANCE BANNING DATA CENTERS TOWN-WIDE

292. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

293. "[I]t is well settled in this State that a municipality has only those powers granted to it by statute…" Fred v. Mayor & Council of Borough of Old Tappan, 10 N.J. 515, 518 (1952).

294. A municipality's power and authority to regulate zoning and land use is derived exclusively from the MLUL.

295. The authority to adopt the MLUL is derived exclusively from the New Jersey Constitution.

296. Article IV, Section VI, Paragraph 2 sets forth the power to zone as follows:

> The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances **limiting and restricting to specified districts and regulating therein**, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the **uses of land**, and the exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature.

(Emphasis added).

297. The New Jersey Constitution does not give the Legislature or municipalities the right to outright ban uses.

298. When adopting the MLUL, the New Jersey Legislature clearly understood this limitation based on the language it used when enacting the MLUL.

299. One of the purposes of the MLUL is to "provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open spaces, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens…" N.J.S.A. 40:55D-2(g).

300. Likewise, N.J.S.A. 40:55D-65 sets forth the appropriate contents of a zoning ordinance, one of which is to "[l]imit and restrict buildings and structures **to specified districts**" and to "**regulate** the nature and extent of the use of land for trade, industry, residence, open space or other purposes." N.J.S.A. 40:55D-65(a) (Emphasis added).

301. Nothing in N.J.S.A. 40:55D-65 permits a municipality to outright ban a use.

302. Monroe Township understood this limit also, noting in its Master Plan on page 50 of the Land Use Element, that the Township should regulate industry and to locate industrial uses that could have negative impacts on neighbors within modern industrial zones. See **Exhibit F**.

303. N.J.S.A. 40:55D-62(a) requires that "[t]he zoning ordinance shall be drawn with reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land" and that the zoning should be designed to effectuate the Land Use Element of the Master Plan.

304. Although N.J.S.A. 40:55D-2 sets forth the goals for zoning, the means by which that goal are implemented must be in strict conformance with N.J.S.A. 40:55D-65.

305. To be valid, a zoning ordinance must not only advance the purposes of the MLUL set forth in N.J.S.A. 40:55D-2, but it also must comply with N.J.S.A. 40:55D-65. Berardo v. City of Jersey City, 299 A.3d 844, 852 (Super. Ct. App. Div. 2023).

306. New Jersey Courts have also recognized the limit on zoning under the New Jersey Constitution, stating, "[i[t is not the function of a zoning ordinance to exclude any legitimate use from all property in the city. The constitutional amendment article IV, section 6, paragraph 5, authorizing zoning limited the ordinance to those: '* * * limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use.'" First Church of Christ, Scientist v. Bd. of Adj., 127 N.J.L. 325, 327 (1941).

307. The Courts have also explained that, "[t]he essence of zoning is **territorial division** according to the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division. The constitutional power is couched in such terms. *Constitution of* 1947, *article IV, section VI, paragraph* 2." 165 Augusta St., Inc. v. Collins, 9 N.J. 259, 267 (1952) (internal citations omitted) (emphasis added).

308. A complete ban on any use, rather than limiting said use to a particular zone and adopting appropriate zoning restrictions to regulate said use violates Article IV, Section VI,

Paragraph 2 of the New Jersey Constitution.

309. The complete ban on data centers set forth in the Ordinance Banning Data Centers Town-Wide is unconstitutional because it violates Article IV, Section VI, Paragraph 2 of the New Jersey Constitution.

310. The Ordinance Banning Data Centers Town-Wide is therefore invalid and unenforceable.

## COUNT SIX

## FAILURE TO COMPLY WITH MUNICIPAL ORDINANCES IN DETERMINING COMPLETENESS

311. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

312. Section 175-37.D. of the Township Code sets forth the standard for making a completeness determination, which states, "[a]n application shall be considered complete when the plans, documents and supporting information submitted includes all items required in Chapter 175, Article X, in accordance with the standards in Article XIII and XIV. …"

313. Article X of the Township Code contains the standards for submissions for different types of applications, and Section 175-71 of Article X contains the standards for Preliminary Site Plan submission.

314. The Planning Board was required to comply with the Township Ordinances in determining completeness.

315. The Planning Board had no authority to impose a different standard for determining completeness.

316. Based on its conduct in evaluating other preliminary site plan applications, the Planning Board clearly understood that Section 175-71 of Article X was the standard to use for

determining completeness of a Preliminary Site Plan submission.

317. In fact, the Planning Board utilized Section 175-71 of Article X when it reviewed Hexa's application for the Original Project for completeness.

318. Upon information and belief, the Planning Board and Zoning Board regularly utilized Section 175-71 of Article X as the standard for determining completeness of a preliminary site plan application.

319. The Planning Board's determination of completeness was contrary to the authority delegated to it under the Township Code and was therefore ultra vires and void.

320. The Planning Board's completeness determination is arbitrary, unreasonable and capricious.

321. The completeness determination is therefore invalid and must be overturned.

## COUNT SEVEN

## VIOLATION OF FUNDAMENTAL FAIRNESS - 2026 REDEVELOPMENT PLAN BANNING DATA CENTERS ON THE PROPERTY

322. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

323. The fundamental fairness doctrine "has roots in the New Jersey Constitution and in the New Jersey common law" which serves to create additional constitutional protections than is normally provided in the State and Federal Constitution. In re Directive of the N.J. Dep't of Envtl. Prot., 110 N.J. 69, 81-82 (1988).

324. "New Jersey's doctrine of fundamental fairness, which is encompassed within the protections of Article I, Paragraph 1 of our State Constitution, '"serves to protect citizens generally against unjust and arbitrary governmental action."'" Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 578-79 (2008), Albin concurring.

325. "The doctrine protects against 'unjust and arbitrary governmental action,' in particular, government procedures that operate arbitrarily." Matter of Cong. Dists. by N.J. Redistricting Com'n, 249 N.J. 561, 575-76 (2022).

326. It is applied "'in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation.'" Matter of Cong. Dists. by N.J. Redistricting Com'n, 249 N.J. 561, 575-76 (2022).

327. "Although the doctrine of fundamental fairness has been applied in many contexts, 'there is [always] one common denominator[,]' 'a determination that someone was being subjected to potentially unfair treatment and there was no explicit statutory or constitutional protection to be invoked.'" Constantine v. Twp. of Bass River, 406 N.J. Super. 305, 320 (App. Div. 2009).

328. "Depending on the context, New Jersey's doctrine of fundamental fairness augments 'existing constitutional protections' or exists 'as an independent source of protection against state action.'" Harvard v. State, 460 N.J. Super. 433, 444-45 (App. Div. 2018).

329. The fundamental fairness doctrine "has been invoked when the actions of government, though not quite rising to the level of a constitutional violation, nonetheless included aspects of unfairness that required intervention by the judiciary." In re Galloway Tp. & City of Bridgeton, 418 N.J. Super. 94, 105 (App. Div. 2011).

330. Although Article 1, Paragraph 1 of the New Jersey Constitution does not use the word "due process" or "equal protection," it "seeks to protect against injustice and against the unequal treatment of those who should be treated alike. To this extent, Article 1 safeguards values like those encompassed by the principles of due process and equal protection." Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985).

331. The fundamental fairness doctrine is also an appropriate vehicle for reimbursement after a party has been subject to oppression, harassment or egregious deprivation. Dorchester Manor v. Borough of New Milford, 287 N.J. Super. 114, 116 (App. Div. 1996).

332. "Indeed, few rights are more well-established than the right to own and enjoy one's property without arbitrary interference by the State. That fundamental right is enshrined in our State Constitution. See N.J. Const. art. I, ¶ 1 ('All persons . . . have certain natural and unalienable rights, among which are those . . . of acquiring, possessing, and protecting property. . . .')". Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 185 (2021).

333. The Fundamental Fairness Doctrine protects against arbitrary interference with the right to own an enjoy property. Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 185 (2021).

334. Here, the Property was declared in need of rehabilitation and in need of redevelopment.

335. N.J.S.A. 40A:12A-2(a) acknowledges that there are certain conditions within communities that prevent the development of property without public effort to assist in that development.

336. A redevelopment designation is an acknowledgement that those conditions exist at the Property.

337. Originally, the Mayor and the Township intended to assist Hexa and the Owner in redeveloping the Property by creating zoning that allowed the Property to be developed with a marketable use.

338. At the January 28, 2026 Council meeting, the Mayor acknowledged that Hexa had previously requested a data center use be included as a permitted use in addition to a warehouse

use in order to effectively develop the Property and attract a tenant for the Property.

339. At the time of the original request, the Township agreed that a data center was an appropriate use at the Property and unanimously adopted the 2025 Redevelopment Plan Authorizing Data Centers on the Property.

340. When data centers were added as permitted uses in the 2025 Redevelopment Plan Authorizing Data Centers on the Property, the Planning Board Engineer testified at the March 2, 2025 Planning Board meeting that data centers would be a "great use" for the Property and that a data center would be less intense of a use than the permitted warehouse, storage and distribution uses.

341. When residents thereafter raised concerns regarding data center uses, initially, in response to those concerns, the Township requested that the Planning Board prepare standards regulating data center use to be incorporated into the 2025 Redevelopment Plan Authorizing Data Centers on the Property.

342. Appropriate standards were prepared by the Planning Board, who reviewed them publicly at a public meeting held on March 2, 2026, at which time the Planning Board recommended to the Township Council that the draft standards be adopted.

343. The draft standards were incorporated into draft Ordinance O:19-2026, which was slated for introduction at the March 11, 2026 Township Council Meeting, but the Township arbitrarily and unjustly switched gears and instead of regulating the data centers, chose to outright prohibit data centers at the Property.

344. Because the 2026 Redevelopment Plan Banning Data Centers on the Property constitutes superseding zoning, once the 2026 Redevelopment Plan Banning Data Centers on the Property became effective, the Property can only be developed in accordance with the 2026

Redevelopment Plan Banning Data Centers on the Property.

345. Without the data center, the only permitted uses allowed on the Property are warehouses, storage and distribution facilities and offices in connection with such uses.

346. This constitutes an unreasonable and unfair restriction on the ability to use and enjoy property and violates the Fundamental Fairness doctrine and is an egregious deprivation of Hexa's and the Owner's property rights.

347. The Township's decision to switch gears and prohibit the less intense use is completely arbitrary and violates the Fundamental Fairness doctrine of the New Jersey Constitution.

348. The Township has no evidence to support the conclusion that data centers cannot be adequately regulated.

349. "'[T]he fundamental question in all zoning cases 'is whether the requirements of the ordinance are reasonable under the circumstances.'" Riya Finnegan Ltd. Liab. Co. v. Twp. Council of Tp. of S. Brunswick, 197 N.J. 184, 195 (2008).

350. Zoning power cannot be exercised in excess of the public need. Raskin v. Morristown, 21 N.J. 180, 197 (1956).

351. "[I]t is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority shall not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities…" Katobimar Realty Co. v. Webster, 20 N.J. 114, 122 (1955).

352. "[Z]oning regulation 'must be reasonably designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property'…" Pheasant

Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 291 (2001).

353. The Court has said that "constitutional due process and equal protection ordain that the authority vested in the municipality in zoning matters shall not go beyond the public need, or impress unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities…" Kent v. Mendham, 111 N.J. Super. 67, 77 (App. Div. 1970).

354. It is fundamentally unfair to ban data centers at the Property when adequate regulation can serve both the needs of the residents and protect the property rights of Hexa and the Owner, especially where the Township had previously determined that the Property was an appropriate site for data center use.

355. Certainly, fundamental fairness equally prohibits zoning regulation that imposes unnecessary and excessive restrictions such as a total ban on data centers on the Property.

356. The 2026 Redevelopment Plan Banning Data Centers on the Property is therefore invalid and unenforceable.

## COUNT EIGHT

## VIOLATION OF FUNDAMENTAL FAIRNESS - THE ORDINANCE BANNING DATA CENTERS

357. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

358. Article I, Paragraph 1 of the New Jersey Constitution, includes a protection of fundamental fairness to prevent against unjust and arbitrary action by the government. Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 578-79 (2008), Albin concurring.

359. The Fundamental Fairness Doctrine prevents egregious deprivation, and government oppression or harassment. Matter of Cong. Dists. by N.J. Redistricting Com'n, 249 N.J. 561, 575-76 (2022).

360. The Fundamental Fairness Doctrine protects against arbitrary interference with the right to own an enjoy property. Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 185 (2021).

361. An outright ban of all data centers in all areas and on all property within the Township of Monroe constitutes an unreasonable and unfair restriction of the ability to use and enjoy property and violates the Fundamental Fairness doctrine.

362. Despite recognition that data centers would be a “great use” for the Property and that a data center would be less intense of a use than the permitted warehouse, storage and distribution uses, the Township concluded that a full ban of all data center use at all property was necessary.

363. The Township has failed to establish that reasonable regulations are unable to address all of the concerns of the residents.

364. A full ban of all data centers, rather than regulation of the same is completely arbitrary and violates the Fundamental Fairness doctrine of the New Jersey Constitution.

365. Unsubstantiated fear is not a valid basis for making zoning decisions.

366. A zoning ordinance must also be “‘reasonably designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property[.]’” Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 291 (2001).

367. Moreover, a zoning regulation which exceeds the public need is arbitrary and unreasonable. Bailes v. Twp. of E. Brunswick, 380 N.J. Super. 336, 348 (App. Div. 2005).

368. By enacting a full municipal-wide ban of data centers, the Ordinance Banning Data Centers Town-Wide imposes unnecessary and excessive restrictions on the use of private property, and particularly as it relates to the Property, which was previously found to be a great location for

data center use.

369. There is no evidence whatsoever that the regulations proposed by the Planning Board would be insufficient to adequately address the concerns of the public.

370. The Ordinance Banning Data Centers Town-Wide is unconstitutional because it violates the Fundamental Fairness doctrine of the New Jersey Constitution.

371. In addition, ordinances can be unconstitutional and/or unreasonable as applied to a particular property. Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 286 (2001).

372. A ban on data centers, as applied to the Property, is unconstitutional and unreasonable given that the Property was previously determined to be an appropriate site for data centers by the Township and the Planning Board, and that finding was further approved by the Pinelands Commission.

373. The Ordinance Banning Data Centers Town-Wide is therefore invalid and unenforceable.

374. The Ordinance Banning Data Centers Town-Wide is therefore invalid and unenforceable as applied to the Property.

## COUNT NINE

## VIOLATION OF FUNDAMENTAL FAIRNESS – COMPLETENESS DETERMINATION

375. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

376. "New Jersey's doctrine of fundamental fairness, which is encompassed within the protections of Article I, Paragraph 1 of our State Constitution, '"serves to protect citizens generally against unjust and arbitrary governmental action."'" Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 578-79 (2008), Albin concurring.

377. "The doctrine protects against 'unjust and arbitrary governmental action,' in particular, government procedures that operate arbitrarily." Matter of Cong. Dists. by N.J. Redistricting Com'n, 249 N.J. 561, 575-76 (2022).

378. When the Planning Board considered completeness for the application for the Original Project, it utilized the standards set forth in Section 175-71 for determining completeness.

379. However, when the Planning Board considered the Data Center Application, it utilized a completely different standard for determining completeness, namely Section 175-61 of the Township Code.

380. In addition, when determining completeness for the Data Center Application, the Planning Board utilized a completely different procedure for deciding completeness.

381. Unlike the determination of completeness for the application for the Original Project, the Planning Board scheduled a special meeting for the purposes of making a determination on completeness for the Data Center Application.

382. The decision of the Planning Board to change the standard for determining completeness for preliminary site plan applications only as applied to the Data Center Use constitutes unjust and arbitrary governmental action and arbitrary governmental procedures.

383. Failing to comply with the express terms of Section 175-37.D., which requires that an application be "considered complete when the plans, documents and supporting information submitted includes all items required in Chapter 175, Article X, in accordance with the standards in Article XIII and XIV" constitutes unjust and arbitrary governmental action and arbitrary governmental procedures.

384. The conduct of the Planning Board violates the fundamental fairness doctrine.

385. In addition, Hexa requested submission waivers at the May 12, 2026 Planning Board meeting.

386. However, the Planning Board refused to even consider the submission waivers and made absolutely no findings regarding the submission waivers other than a statement that the Township Engineer has recommended no waivers be granted.

387. The recommendation of the Township Engineer that no waivers be granted contains no basis for the recommendation and contains only a net opinion that "[b]ased upon our review of the above-referenced documents, we do not recommend granting waivers for the submission items identified in the completeness review letter and concur that the application is incomplete."

388. Reliance on a net opinion to deny submission waivers violates the fundamental fairness doctrine.

389. Failure of the Planning Board to consider any waivers of submission requirement despite the Applicant's request for submission waivers constitutes unjust and arbitrary governmental action and arbitrary governmental procedures.

390. Refusal of the Planning Board to recognize that the Data Center Application was an amended application and is entitled to rely upon documents previously submitted constitutes unjust and arbitrary governmental action and arbitrary governmental procedures.

391. The Planning Board had no basis in law or in fact to declare the Data Center Application not complete.

392. Applying a totally different standard for determining completeness for the Data Center Application was an unjust and arbitrary governmental action, especially when every other application for preliminary site plan approval was governed by Section 175-71.

393. Requiring a new Certificate of Filing from the Pinelands Commission for the data center use was an unjust and arbitrary governmental action the changes proposed to the application were not considered a development under N.J.A.C. 7:50-4.1(a)(23) & N.J.A.C. 7:50-4.1(a)(8)(i).

394. The Planning Board declared the Data Center Application not complete because of the directive to prevent a data center use within the Township and to deny any data center use application.

395. The Planning Board's actions violate the fundamental fairness doctrine under the New Jersey Constitution

396. The Planning Board's determination of that the Data Center Application was not complete was therefore invalid and must be overturned.

**COUNT TEN**

**VIOLATION OF THE DORMANT COMMERCE CLAUSE**
**ORDINANCE BANNING DATA CENTERS TOWN-WIDE**

397. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

398. The Interstate Commerce Clause grants the United States Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes…"

399. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States…" New York v. United States, 505 U.S. 144, 156 (1992).

400. Therefore, under the Commerce Clause (in conjunction with the 10th Amendment), States and local governments are prohibited from adopting laws that apply to "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the

State." Healy v. Beer Inst., 491 U.S. 324, 336 (1989).

401. The Commerce Clause includes a "the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" Pork Producers Council v. Ross, 598 U.S. 356, 368 (2023).

402. This negative command is known as the dormant Commerce Clause. Pork Producers Council v. Ross, 598 U.S. 356, 368 (2023).

403. A law that impacts "arteries of commerce' such as 'trucks, trains, and the like'" could potentially be struck down under the commerce clause. Pork Producers Council v. Ross, 598 U.S. 356, 392 (2023).

404. In Transcon. Gas Pipe Line Corp. v. Hackensack Meadowlands Dev. Com., 464 F.2d 1358, 1363 (3d Cir. 1972) struck down action of the Hackensack Meadowlands Development Commission that prohibited a natural gas pipeline was "an 'unwarranted imposition upon interstate commerce'" because it impacted the "adequate and efficient supply and delivery of natural gas" to the New York metropolitan area.

405. "Congress' power to regulate interstate commerce also reaches the transmission of information by computer for the purpose of purchasing lottery tickets." Pic-A-State Pa. v. Reno, 76 F.3d 1294, 1301 (3d Cir. 1996).

406. The internet has been held to be an "instrumentality and channel of interstate commerce." United States v. MacEwan, 445 F.3d 237, 245 (3d Cir. 2006).

407. "'The Internet is an international network of interconnected computers . . . [and is comparable] to both a vast library including millions of readily available and indexed publications

and a sprawling mall offering goods and services.' Reno v. ACLU, 521 U.S. 844, 850-853, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)." United States v. MacEwan, 445 F.3d 237, 244 (3d Cir. 2006).

408. Congress has included regulation of computers engaged in interstate commerce. See 18 U.S.C. §1030(e)(1) (defining a "'computer'" to include "any data storage facility…" and a "'protected computer'" as one "used in or affecting interstate or foreign commerce or communication…").

409. "Using a computer connected to the Internet equates to 'the use of a facility or means of interstate commerce,' even though the communications in question may have actually been intrastate in character." United States v. Tykarsky, No. 03-400, 2004 U.S. Dist. LEXIS 15392, at *7 (E.D. Pa. July 20, 2004).

410. Data centers are part of "[m]odern e-commerce" because companies can lease data storage in other states, and present a "virtual showroom" from anywhere. South Dakota v. Wayfair, Inc., 585 U.S. 162, 180-81 (2018).

411. As a result, prohibition of data centers municipal-wide is a violation of the dormant commerce clause because data centers are an artery or channel of commerce.

412. According to Amazon, "[d]ata centers are the foundation for technology we all love—generative AI, streaming services, mobile apps, personalized shopping, even the cloud itself. They're the engine that enables financial institutions, healthcare providers, government agencies, and your favorite companies to deliver the service you want, when you want it. Data centers are a core part of everything we're building at AWS, and it's our data center specialists who make it all possible." https://www.amazon.jobs/content/en/teams/amazon-web-services/data-centers.

413. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, 397 U.S. 137, 142 (1970).

414. "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike v. Bruce Church, 397 U.S. 137, 142 (1970).

415. A complete ban on such instrumentalities and channels of interstate commerce, such as the data center ban, exceeds the legitimate local interest.

416. Any legitimate interest of the Township regarding data centers can be achieved through regulation of data centers rather than a full ban.

417. A law that banned 65-foot double trailer truck on state highways violated the Commerce Clause because even though the State had a valid interest in highway safety, the regulation was excessive compared to the State's interest. Kassel v. Consol. Freightways Corp., 450 U.S. 662, 671 (1981).

418. The Ordinance Banning Data Centers Town-Wide is unconstitutional and therefore invalid and unenforceable.

419. Hexa has been damaged by the Township's actions.

## COUNT ELEVEN

## VIOLATION OF THE MUNICIPAL LAND USE LAW
## ORDINANCE BANNING DATA CENTERS TOWN-WIDE

420. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

421. "To be sure, municipalities do not have the inherent power to zone; rather, '[z]oning is a police power that is vested in the legislative branch of government.'" Shipyard Assocs., LP v. City of Hoboken, 242 N.J. 23, 39 (2020).

422. "As we have previously held, municipalities must exercise their powers relating to zoning and land use in a manner that will strictly conform with that statute's provisions." N.J. Shore Builders Ass'n v. Twp. of Jackson, 199 N.J. 449, 452 (2009).

423. The Municipal Land Use Law, N.J.S.A. 40:55D-1, et seq. ("MLUL") sets forth the statutory authority for a municipality to exercise its powers related to zoning.

424. The Ordinance Banning Data Centers Town-Wide is contrary to and violates several provisions of the MLUL.

425. N.J.S.A. 40:55D-70(d) authorizes a zoning board of adjustment to grant variances to allow a use that is not otherwise permitted in a zoning district.

426. Section 175-163.5.D. of the Ordinance Banning Data Centers Town-Wide prohibits the granting of use variances for data center use in violation of N.J.S.A. 40:55D-70(d).

427. Specifically, Section 175-163.5.D makes it a violation of the Ordinance Banning Data Centers Town-Wide to apply for any approval involving a data center use.

428. An application for a use variance for a data center is an application for an approval involving a data center use.

429. Thus, no one could apply for a use variance to permit a data center use without violating Section 175-163.5.D of the Ordinance Banning Data Centers Town-Wide.

430. Nothing in the MLUL authorizes the Township to prohibit applications for use variances.

431. Attempting to prohibit application for use variances violates the MLUL.

432. Moreover, Section 175-163.5.G. of the Ordinance Banning Data Centers Town-Wide penalizes any "person, entity, developer, property owner, tenant or operator" who even applies for a use variance pursuant to N.J.S.A. 40:55D-70(d).

433. The Ordinance Banning Data Centers Town-Wide violates the provisions of the MLUL by prohibiting a use variance that is statutorily authorized under N.J.S.A. 40:55D-70(d).

434. N.J.S.A. 40:55D-49, provides that the granting of preliminary site plan approval confers upon the applicant certain vested rights, including the right that "the general terms and conditions on which preliminary approval was granted shall not change…"

435. Similarly, N.J.S.A. 40:55D-52(a) provides that an applicant obtaining final site plan approval shall be vested with the right that the terms upon which final approval is granted "shall not be changed for a period of two years after the date on which the final resolution of final approval is adopted…"

436. N.J.S.A. 40:55D-46.1(c) also vests rights in an approval for a minor site plan and provides protection from a change in zoning for a period of two years from the grant of the minor site plan approval.

437. Section 175-163.5.F. of the Ordinance Banning Data Centers Town-Wide purports to eliminate all of the vesting rights granted by the MLUL as it relates to approvals for data centers.

438. Moreover, Section 175-163.5.G. of the Ordinance Banning Data Centers Town-Wide penalizes any "person, entity, developer, property owner, tenant or operator" who attempts to "[e]stablish, construct, reconstruct, alter, expand, or operate a Data Center" even if they have vested rights to do so.

439. Subsection F of Section 175-163.5 of the Ordinance Banning Data Centers Town-Wide states that any prior approval for a site plan or zoning permit does not vest any rights to

construct a data enter.

440. The Ordinance Banning Data Centers Town-Wide violates the provisions of the MLUL by attempting to terminate vested rights granted under N.J.S.A. 40:55D-46.1(c), N.J.S.A. 40:55D-49 and N.J.S.A. 40:55D-52(a) of the MLUL.

441. The Ordinance Banning Data Centers Town-Wide is void and invalid for failure to comply with the MLUL.

**COUNT TWELVE**

**42 U.S.C. § 1983 CLAIMS**

442. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

443. The Ordinance Banning Data Centers Town-Wide, violates the Equal Protection rights and the First Amendment rights of Hexa and the Owner, guaranteed under the United States Constitution, as it applies to the Property.

444. The 2026 Redevelopment Plan Banning Data Centers on the Property violates the Equal Protection rights of Hexa and the Owner, guaranteed under the United States Constitution, as it applies to the Property.

445. Federal statute, 42 U.S.C. §1983, states in relevant part, that any person who, under color of law, deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

446. "To state a claim for relief in an action brought under §1983, respondents must establish [1] that they were deprived of a right secured by the Constitution or laws of the United States, and [2] that the alleged deprivation was committed under color of state law." Am. Mfrs.

Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999).

447. The Fourteenth Amendment of the United States Constitution protects against the denial of equal protection of the laws.

448. Moreover, the First Amendment of the United States Constitution protects against infringement of the right of free speech.

449. "[A] municipality can be held liable as a person under section 1983 when it unconstitutionally implements or enforces 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by' the officers of that municipality." Langford v. City of Atl. City, 235 F.3d 845, 847 (3d Cir. 2000).

450. Adoption of a zoning ordinance therefore constitutes action under "color of state law" for purposes of a Section 1983 claim. Timber Props. v. Chester, 205 N.J. Super. 273, 282 (Law Div. 1984).

451. The Township's policy of a municipal-wide ban of data centers has resulted in the deprivation of constitutional rights belonging to Hexa and the Owner guaranteed under the United States Constitution.

452. Hexa and the Owner have been damaged and are entitled to relief under Section 1983, including injunctive relief preventing the enforcement of the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) and the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026), the award of damages and the award of attorneys' fees.

453. Both 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) and the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) are policies of the Township.

454. Municipal ordinances are considered municipal policies for purposes of Section 1983 liability. Lindke v. Freed, 601 U.S. 187, 200 (2024).

455. The Planning Board's decision to apply a different standard for determining completeness to the Data Center Application than it applied to all other preliminary site plan applications, including the preliminary site plan application for the Original Project violated the equal protection clause of the United States Constitution.

456. This conduct was undertaken pursuant to a policy of the Township which directed the Planning Board and its professionals to prevent a data center use within the Township and to deny any application for a data center use that came before the Planning Board.

457. A policy can be created "where 'the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy'…" Tucker v. City of Phila., 679 F. Supp. 3d 127, 141 (D.N.J. 2023).

458. The Mayor's statement directing the Planning Board and its professionals to block data center applications and to flat out deny such applications is policy of the Township, which was implemented by the Planning Board and its professionals.

459. "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." Bd. of the Cty. Of Comm'rs v. Brown, 520 U.S. 397, 404-405 (1997).

460. The Planning Board is an authorized decisionmaker for purposes of determining completeness.

461. By purposefully changing the standard for determining completeness only for the Data Center Application, so that the Data Center Application could be deemed incomplete, when completeness for every other preliminary site plan approval evaluated under Section 175-71, the

Planning Board intentionally deprived plaintiff of the federally protected right of equal protection.

462. Hexa and the Owner have been damaged and are entitled to relief under Section 1983, including injunctive relief mandating that the Planning Board apply Section 175-71 as the standard for determining completeness along with a determination of completeness, the award of damages and the award of attorneys' fees.

**COUNT THIRTEEN**
**NJ CIVIL RIGHTS ACT**

463. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

464. N.J.S.A. 10:6-2(c) of the New Jersey Civil Rights Act ("CRA") authorizes any person who has been deprived of "any substantive rights, privileges or immunities secured by the Constitution or laws of this State" or whose exercise or enjoyment of said rights has been interfered with to bring a civil action for damages.

465. The CRA is analogous to 42 U.S.C. 1983; while Section 1983 applies to deprivation of federal rights, the CRA provides a cause of action for deprivation of substantive rights under the New Jersey Constitution and its laws. Gormley v. Wood-El, 218 N.J. 72, 97 (2014).

466. By enacting the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) and the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026), the Township and the Planning Board have violated Hexa's and the Owner's substantive rights authorized under the MLUL and the Local Redevelopment and Housing Laws, including, but not limited to the right to apply for a use variance.

467. In addition, enacting the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) and the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026), the Township and the Planning Board have violated Hexa's and the Owner's

substantive rights guaranteed under the New Jersey Constitution, including but not limited to: (a) violation of the Fundamental Fairness doctrine guaranteed by Article I, Paragraph 1 of the New Jersey Constitution; (b) Equal Protection rights guaranteed under Article 1, Paragraph 1 of the New Jersey Constitution; (c) freedom of speech guaranteed under Article I, Paragraph 6 of the New Jersey Constitution; and (d) zoning rights guaranteed under Article IV, Section VI, Paragraph 2 of the New Jersey Constitution.

468. The Township and the Planning Board violated Hexa's and the Owner's substantive rights guaranteed under the New Jersey Constitution, the Municipal Land Use Law and the Township's Ordinances, in failing to deem the Application complete and in applying a different standard for determining completeness, including but not limited to: (a) violation of the Fundamental Fairness doctrine guaranteed by Article I, Paragraph 1 of the New Jersey Constitution; (b) Equal Protection rights guaranteed under Article 1, Paragraph 1 of the New Jersey Constitution; (c) violation of the Municipal Land Use Law's uniformity requirements; and (d) violation of Section 175-37.D of the Township Code.

469. The Township further violated Hexa's and the Owner's substantive rights guaranteed under N.J.S.A. 40:55D-10.5.

470. In enacting N.J.S.A. 40:55D-10.5, the New Jersey Legislature intended to grant applicants a substantive right to be protected from zoning changes once a complete application has been submitted.

471. N.J.S.A. 40:55D-10.5 was adopted to prevent the injustice of a municipality changing the zoning applicable to a developer's property while an application was pending. Hoboken for Responsible Cannabis, Inc. v. City of Hoboken Planning Bd., 327 A.3d 971, 985 (Super. Ct. App. Div. 2024).

472. This is a substantive right and not a procedural right because it is related to due process and the right to be heard at a meaningful time and at a meaningful place.

473. Where the Legislature adopted a statute for the purposes of conferring a right, and the right is clear and enforceable, and the obligation is binding upon a governmental entity, the statute confers a substantive right. Harz v. Borough of Spring Lake, 191 A.3d 547, 555 (N.J. 2018).

474. The Township's policy of a municipal-wide ban of data centers has resulted in the deprivation of constitutional rights and statutory rights belonging to Hexa and the Owner guaranteed by the Constitution and laws of this State in violation of the Civil Rights Act.

475. The Township articulated a policy at the March 25, 2026 Township Council Meeting, directing that the Planning Board and its professionals do everything in their power to block a data center and to deny a data center application.

476. The Planning Board implemented that policy when it changed the standard for determining completeness and refused to issue a determination that the Data Center Application was in fact complete, in order to avoid the time of application rule.

477. Hexa and the Owner have been damaged and are entitled to relief under N.J.S.A. 10:6-2(c), including the award of damages.

478. Hexa and the Owner are entitled to injunctive relief under N.J.S.A. 10:6-2(c): (a) preventing the enforcement of the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026); (b) preventing enforcement of the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026); (c) enjoining the Planning Board from preventing the Data Center Application from being deemed complete and requiring the Planning Board to conduct a hearing on the Data Center Application.

479. The Planning Board's decision to apply a different standard for determining completeness to the Data Center Application than it applied to all other preliminary site plan applications, including the preliminary site plan application for the Original Project violated the equal protection clause of the New Jersey Constitution.

480. This conduct was undertaken pursuant to a policy of the Township which directed the Planning Board and its professionals to prevent a data center use within the Township and to deny any application for a data center use that came before the Planning Board.

481. The Planning Board's decision to apply Section 175-61 as the standard for determining completeness instead of Section 175-71 deprived Hexa and the Owner of a right secured by the laws of the State of New Jersey, including the MLUL and Section 175-37.D of the Township Code.

482. Hexa and the Owner have been damaged and are entitled to relief under N.J.S.A. 10:6-2(c), including injunctive relief mandating that the Planning Board apply Section 175-71 as the standard for determining completeness along with a determination that the Data Center Application is complete.

483. Hexa and the Owner are entitled to damages and the award of attorneys' fees under N.J.S.A. 10:6-2(c).

## COUNT FOURTEEN

## ARBITRARY UNREASONABLE AND CAPRICIOUS - 2026 REDEVELOPMENT PLAN BANNING DATA CENTERS ON THE PROPERTY

484. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

485. N.J.S.A. 40A:12A-7(d) states that "[a]ll provisions of the redevelopment plan shall be either substantially consistent with the municipal master plan or designed to effectuate the

master plan…"

486. N.J.S.A. 40A:12A-7(e) makes clear that a determination by a planning board as to consistency with the municipal master plan is required for both redevelopment plans and any amendments to redevelopment plans.

487. At the April 9, 2026 Planning Board meeting, the Planning Board Planner testified that the 2026 Redevelopment Plan Banning Data Centers on the Property was substantially consistent with the Master Plan adopted in 2022 because it furthered the statement on page 50 of the Master Plan which states "[t]he township should be prepared to **regulate** industry not on its traditional classification, but on the impact it has on the community." (Emphasis added).

488. However, the following sentence on page 50 of the Master Plan states "[i]ndustrial zones may be best suited for those uses which cause harm or negatively impact neighbors, where more modern industrial uses (technology, etc.) are permitted in a variety of zones."

489. Nothing on page 50 of the Master Plan indicates an intent to ban any use; rather the recommendation is to regulate uses that have the potential for negative impacts and to place them in industrial zones.

490. Another alleged basis for Master Plan consistency of the 2026 Redevelopment Plan Banning Data Centers on the Property was that it furthered Goal 12 on page 32 of the Master Plan, which is to "[p]repare for a resilient, sustainable future."

491. Again, the objectives listed under that goal, however, recommend regulation and not an outright ban, and include: "[p]romote energy conservation" and "[e]ncourage and support the use of clean energy in new development and redevelopment initiatives."

492. These objectives indicate a recommendation to regulate development so that it is consistent with energy conservation and the use of clean energy.

493. In fact, the 2023 Redevelopment Plan Authorizing Warehouses on the Property and the 2025 Redevelopment Plan Authorizing Data Centers on the Property already included the use of clean energy technologies.

494. Section 6.e. on page 10 of the 2023 Redevelopment Plan Authorizing Warehouses on the Property (which is also applicable to the 2025 Redevelopment Plan Authorizing Data Centers on the Property), requires that "[a]ll buildings of 100,000 square feet or more shall be designed and constructed to support solar installation in accordance with P.L. 2021, c.290."

495. In addition, permitted accessory uses under the 2023 Redevelopment Plan Authorizing Warehouses on the Property (which is also applicable to the 2025 Redevelopment Plan Authorizing Data Centers on the Property), includes "Renewable Energy Sources such as Solar Facilities, Wind or Hydroelectric systems – To Service the Site…"

496. The Federal Energy Management Program has prepared a document entitled, "Best Practices Guide for Energy-Efficient Data Center Design," revised July 2024, which sets forth standards for clean energy and energy conservation in data center construction, such as air management standards, cooling systems standards, electrical systems standards, waste heat standards, and efficiency standards.

497. In addition, the proposed regulations created by the Planning Board for the data center use on the Property included standards for energy conservation and the use of clean energy, such as fuel system standards, utility standards, water consumption standards, lighting standards, and emission standards.

498. Clean energy is also already supported under the 2025 Redevelopment Plan Authorizing Data Centers on the Property because permitted accessory uses include "Renewable Energy Sources such as Solar Facilities, Wind or Hydroelectric systems – To Service the Site[.]"

499. Nothing in Goal 12 or the objectives to that goal support or recommend an outright ban on data centers; rather they recommend adopting appropriate standards to further Goal 12 and its objectives.

500. Page 61 of the Master Plan specifically recommends that the Township "[i]ncorporate recommendations or requirements related to the use of clean energy into the zoning code, redevelopment plans, and/or developer agreements for future development and redevelopment."

501. The preliminary investigation which formed the basis for concluding the Property was in need of redevelopment reviewed the relationship of the redevelopment of the Property to the Master Plan and noted that a redevelopment plan could satisfy Goal 12, which states, "[p]repare for a resilient, sustainable future" by ensuring that the redevelopment "compl[ied] with modern flood requirements, including New Jersey's recently adopted inland flood rules, pursuant to N.J.A.C. 7:13."

502. Thus, Goal 12 had nothing to do with prohibiting data centers as a permitted use.

503. Finally, Goal 4 and Goal 5 on page 115-116 of the Master Plan were cited to support the claim of Master Plan consistency.

504. Goal 4 recommends that the Township "Promote Public Health and Wellness" and Goal 5 recommends that the Township "Embrace sustainable Economic Development."

505. However, neither of the objectives under that goal relate at all to data centers.

506. Rather, the objectives of Goal 4 are to "[p]rovide access to exercise and recreation opportunities" and to "[p]romote environmental justice as part of municipal operations and actions."

507. The site is not in an overburdened community, as identified by the New Jersey

Department of Environmental Protection, and therefore environmental justice considerations are not implicated.

508. Again, the preliminary investigation which formed the basis for concluding the Property was in need of redevelopment reviewed the relationship of the redevelopment designation to the Master Plan and noted that a redevelopment plan could satisfy Goal 4 by extending "public water to the site to accommodate redevelopment" which would "provide access to safe drinking water to neighboring properties, many of which are currently located within a CKE where there is known groundwater pollution."

509. Thus, Goal 4 would be satisfied by the mere extension of public water to the Property and had nothing to do with prohibiting data centers.

510. Likewise, one of the objectives of Goal 5 is to "[s]upport resilient and green infrastructure to respond to the needs of residents, businesses and visitors."

511. Page 117 of the Master Plan explains that green infrastructure "refers to a design technique used to manage stormwater in a way that mimics or employs natural processes to capture stormwater where it falls enabling it to absorb into the ground or planted areas, evaporate, or be stored for reuse, instead of immediately directing it toward a storm sewer.

512. That same section of the Master Plan also acknowledges that "[t]he New Jersey Department of Environmental Protection (NJDEP) recently adopted changes to the state's stormwater management rules (N.J.A.C. 7:8) that will require developers to utilize green infrastructure to meet the minimum stormwater management standards for water quality, groundwater recharge, and stormwater volume control as part of any major development."

513. Therefore, Goal 5 is already being advanced through existing stormwater regulations.

514. Importantly, one of the Planning Board members asked how data centers could have been included in the 2025 Redevelopment Plan Authorizing Data Centers on the Property in the first place if a total ban was substantially consistent with the Master Plan.

515. The Planning Board Planner responded that the Master Plan had internally inconsistent statements.

516. However, the Planning Board Planner acknowledged that originally, the inclusion of data centers was intended to further Goal 8 of the land use objectives, which is to "[s]upport commercial and industrial businesses by anticipating and adapting to changing uses, economies and market demand."

517. The objectives under this goal recommend that the Township "[c]onsider performance standards in the siting or rezoning of industrial development to both expand the locations of possible uses and provide adequate safeguards to protect the environment and incompatible adjacent uses" and to "[e]xpand and reconsider industrial use classifications to align with modern industrial formats and uses."

518. The Planning Board Planner acknowledged that a data center is a newer use and expressed concerns regarding the impact of the potential use on the community.

519. Nothing in the Master Plan recommends or supports banning data centers or any industrial use outright.

520. Rather, everything in the Master Plan recommends allowing new and modern industrial uses, such as data centers, placing such uses in industrial zones, and establishing appropriate standards to regulate those uses in order to protect the public from any potential impacts of those uses.

521. The Planning Board Planner only offered a net opinion that the 2026 Redevelopment Plan Banning Data Centers on the Property was substantially consistent with the Master Plan.

522. In order to avoid giving a net opinion, an expert must """give the why and wherefore" that supports the opinion, "rather than a mere conclusion.""" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014).

523. "'An expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is "personal."''" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014).

524. The Planning Board and the Township are not permitted to rely upon the net opinion of the Planning Board Planner.

525. The Master Plan envisions regulation of industrial uses such as a data center, while still permitting those uses in certain zones.

526. Thus, the 2026 Redevelopment Plan Banning Data Centers on the Property is not substantially consistent with and is not designed to effectuate the Master Plan and the 2026 Redevelopment Plan Banning Data Centers on the Property violates N.J.S.A. 40A:12A-7(d).

527. The Planning Board never explained why the Master Plan called for an outright ban on data centers as opposed to stringent regulation of data center use.

528. Importantly, it cannot be both substantially consistent with the Master Plan to permit data center uses and at the same time be substantially consistent with the Master Plan to support a ban of the same.

529. "The presumption of the validity of local legislative action, however, is constrained by the obvious understanding that '[a] statute has supremacy over an ordinance,' and 'a local

municipality is but a creature of the State, capable of exercising only those powers granted to it by the Legislature . . . .'" Timber Glen Phase III, Ltd. Liab. Co. v. Twp. of Hamilton, 441 N.J. Super. 514, 524 (App. Div. 2015) (internal citations omitted).

530. Because the Township failed to comply with the requirements of N.J.S.A. 40A:12A-7(d), regarding master plan consistency, the 2026 Redevelopment Plan Banning Data Centers on the Property is invalid and must be overturned.

## COUNT FIFTEEN

## ARBITRARY UNREASONABLE AND CAPRICIOUS - ORDINANCE BANNING DATA CENTERS

531. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

532. N.J.S.A. 40:55D-64 requires a municipality to refer a proposed zoning ordinance or amendment to a zoning ordinance to the municipal planning board for review pursuant to N.J.S.A. 40:55D-26.

533. Upon referral, N.J.S.A. 40:55D-26(a) requires that the planning board review the proposed zoning ordinance or amendment to determine if it is inconsistent with the provisions of the master plan.

534. N.J.S.A. 40:55D-62 requires that "[a]ll of the provisions of such zoning ordinance or any amendment or revision thereto shall be either substantially consistent with the land use element and the housing plan element of the master plan or be designed to effectuate such elements…"

535. At the April 9, 2026 Planning Board meeting, the Ordinance Banning Data Centers Town-Wide was reviewed and the Planning Board Planner testified that the Ordinance Banning Data Centers Town-Wide advanced the following Master Plan goals: (a) Goal 4 of the Land Use

Element; (b) Goal 5 of the Green Building & Environmental Sustainability Element; and (c) Goal 12 of the Green Building & Environmental Sustainability Element. See **Exhibit K.**

536. N.J.S.A. 40:55D-62 only requires consistency with the land use element and housing plan element, and does not require consistency with the green building and environmental sustainability element.

537. Goal 4 of the Land Use Element, on page 31 of the Master Plan recommends that the Township "[d]irect growth to areas where infrastructure capacity is currently available or planned."

538. As part of the objectives, Goal 4 of the Land Use Element of the Master Plan recommends that the Township consider "the costs and benefits of any utility extension to ensure such extension promotes the logical and orderly extension of development adjacent to existing development" and that the Township "[e]mpower the community through the use of redevelopment to establish realistic market driven and financially feasible development and redevelopment."

539. According to page 24 of the 3043 South Black Horse Pike Determination of Need Study, dated January 18, 2024, nearly all of the Property is located within the Statewide sewer service area and while water and sewer is currently not directly available at the Property, it was determined that Goal 4 is advanced by redevelopment of this Property because development will help extend water and sewer to this area of the Township.

540. Page 25 of the 3043 South Black Horse Pike Determination of Need Study found that redevelopment of the Property would promote Goal 4 of the Green Building & Environmental Sustainability Element because "[e]*xtension of public water to the site to accommodate redevelopment would provide access to safe drinking water to neighboring properties, many of which are currently located within a CKE where there is known groundwater pollution."* (Emphasis

original).

541. Originally, when the Ordinance Authorizing Data Centers was adopted permitting data centers on the Property, it was determined that the Redevelopment Plan amendment was consistent with Goal 8 of the Land Use Element, which is to "[s]upport commercial and industrial businesses by anticipating and adapting to changing uses, economies and market demand."

542. The objectives under this goal recommend that the Township "[c]onsider performance standards in the siting or rezoning of industrial development to both expand the locations of possible uses and provide adequate safeguards to protect the environment and incompatible adjacent uses" and to "[e]xpand and reconsider industrial use classifications to align with modern industrial formats and uses."

543. On page 50 of the Master Plan, which is included within the Land Use Element, it recommends that "[t]he township should be prepared to **regulate** industry not on its traditional classification, but on the impact it has on the community" (emphasis added), and further recommends that "[i]ndustrial zones may be best suited for those uses which cause harm or negatively impact neighbors, where more modern industrial uses (technology, etc.) are permitted in a variety of zones."

544. Data centers are a modern industrial use involving technology and are the type of technological industrial uses anticipated for inclusion in industrial zones.

545. When the Ordinance Authorizing Data Centers was adopted, the Planning Board Planner testified that data centers would be a "great use" for the Property and that a data center would be less intense of a use than the permitted warehouse, storage and distribution uses.

546. Since it was substantially consistent with the Master Plan, and in particular the Land Use Element, to redevelop the Property with a Data Center, it cannot now be substantially

consistent with the Land Use Element to ban all data centers in all zones.

547. In fact, a full ban of data centers in all zones of the Township directly contradicts the objectives of Goal 8 of the Land Use Element, which are to "[c]onsider performance standards in the siting or rezoning of industrial development to both expand the locations of possible uses and provide adequate safeguards to protect the environment and incompatible adjacent uses" and to "[e]xpand and reconsider industrial use classifications to align with modern industrial formats and uses."

548. A full municipal-wide ban of data centers in all zones of the Township also directly contradicts the recommendations on page 50 of the Land Use Element, where it recommends that the Township regulate industry and locate industrial uses that could have negative impacts on neighbors within modern industrial zones.

549. Nothing in the Master Plan recommends or supports banning data centers or any industrial use outright.

550. Rather, everything in the Master Plan recommends allowing new and modern industrial uses, such as data centers, placing such uses in industrial zones, and establishing appropriate standards to regulate those uses in order to protect the public from any potential impacts of those uses.

551. The Planning Board Planner only offered a net opinion that Ordinance O:25-2026 was substantially consistent with the Master Plan.

552. In order to avoid giving a net opinion, an expert must """give the why and wherefore" that supports the opinion, "rather than a mere conclusion."""  Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014).

553. "'An expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is "personal."'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014).

554. The Planning Board and the Township were not permitted to rely upon the net opinion of the Planning Board Planner.

555. Thus, the Ordinance Banning Data Centers Town-Wide is not substantially consistent with and is not designed to effectuate the Master Plan and the Ordinance Banning Data Centers Town-Wide violates the requirement in N.J.S.A. 40:55D-62 to ensure consistency with the Master Plan.

556. The Planning Board never explained why the Master Plan called for an outright ban on data centers as opposed to regulation of data center use.

557. Rather, the Master Plan envisions regulation of industrial uses such as a data center, while still permitting those uses in industrial zones.

558. Importantly, it cannot be both substantially consistent with the Master Plan to permit data center uses and at the same time be substantially consistent with the Master Plan to support a ban of the same.

559. "The presumption of the validity of local legislative action, however, is constrained by the obvious understanding that '[a] statute has supremacy over an ordinance,' and 'a local municipality is but a creature of the State, capable of exercising only those powers granted to it by the Legislature . . . .'" Timber Glen Phase III, Ltd. Liab. Co. v. Twp. of Hamilton, 441 N.J. Super. 514, 524 (App. Div. 2015) (internal citations omitted).

560. Because the Township failed to comply with the requirements of N.J.S.A. 40:55D-62, the Ordinance Banning Data Centers Town-Wide is invalid and must be overturned.

561. In addition, the definition of Accessory Server Rooms in the Ordinance Banning Data Centers Town-Wide is arbitrary, unreasonable and capricious.

562. After broadly defining "Data Center," Section 175-163.5.B. of the Ordinance Banning Data Centers Town-Wide excludes "Accessory Server Rooms" from the definition of "Data Center" but limits "Accessory Server Rooms to 2% of the gross floor area of the principal structure.

563. Such a restriction on Accessory Server Rooms is arbitrary, unreasonable and capricious and does not take into account the needs of any particular type of use, or the potential limits for small structures.

564. For example, in an office building, there may be multiple offices, each of which has a need for its own dedicated server room.

565. If an office is small, say 500 s.f. or less, the dedicated server room could be no bigger than 10 s.f., which would be smaller than a closet, but depending upon the type of work that the office is performing, may be insufficient to meet their needs.

566. In addition, in a large office building, where there are multiple offices, if one office's server room is large due to their needs, and the 2% limit is based on the square footage of the entire structure, the one large office space user could consume all of the dedicated server room space, leaving none for the other office users.

567. Nearly every business has some component which is digital or on-line requiring a server to store important information.

568. Limiting the square footage of such an accessory use to 2% of the total square footage has no rational basis to any legitimate governmental interest.

569. Section 175-11 of the Township Code already defines an accessory use and requires the use to be "subordinate in area, extent and purpose" to the principal use…"

570. In defining "Accessory Server Rooms", Section 175-163.5.B. of the Ordinance Banning Data Centers Town-Wide already includes the concept of subordination in the definition, stating "Accessory Server Rooms are dedicated rooms or space within a facility that houses computer servers and networking equipment that is accessory and subordinate to the primary use within that facility."

571. It is arbitrary, unreasonable and capricious to include an unreasonably small size requirement for the accessory use of Accessory Server Rooms when every other accessory use merely has to be subordinate in size, extent and purpose to its principal use.

572. A zoning ordinance must be "'reasonably designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property[.]'" Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 291 (2001).

573. Moreover, a zoning regulation which exceeds the public need is arbitrary and unreasonable. Bailes v. Twp. of E. Brunswick, 380 N.J. Super. 336, 348 (App. Div. 2005).

574. By enacting a full municipal-wide ban of data centers, the Ordinance Banning Data Centers Town-Wide imposes unnecessary and excessive restrictions on the use of private property, and particularly as it relates to the Property, which was previously found to be a great location for data center use.

575. There is no evidence whatsoever that the regulations proposed by the Planning Board would be insufficient to adequately address the problem.

576. The Ordinance Banning Data Centers Town-Wide is arbitrary, unreasonable and capricious and is invalid and unenforceable.

577. The Ordinance Banning Data Centers Town-Wide is arbitrary, unreasonable and capricious as applied to the Property and is invalid and unenforceable as to the Property.

## COUNT SIXTEEN

## ARBITRARY UNREASONABLE AND CAPRICIOUS – COMPLETENESS DETERMINATION

578. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

579. The Planning Board's decision finding the Data Center Application not complete was arbitrary, unreasonable and capricious.

580. It was arbitrary, unreasonable and capricious to change the standard for determining completeness from Section 175-71 of the Township Code to Section 175-61 of the Township Code, especially when the Planning Board utilized Section 175-71 as the standard when deciding the application for the Original Project.

581. Applying a different standard is contrary to the purposes of the Municipal Land Use Law, which requires that ordinances regulating land development use "'uniform and efficient procedures.'" Griepenburg v. Twp. of Ocean, 220 N.J. 239, 253 (2015).

582. It was arbitrary, unreasonable and capricious to find that the Data Center Application was incomplete for failure to provide an environmental assessment report.

583. Section 175-71 does not require submission of an environmental assessment report in order to be deemed complete.

584. In addition, when the Planning Board considered completeness for the application for the Original Project, no environmental assessment report was required.

585. Rather, Section 5.2 of the Collier's November 18, 2025 letter stated, "[a]n environmental assessment has not been provided, however, the application was submitted to the

Pinelands and therefore, the Certificate of Filing takes precedent for the subject property."

586. It was arbitrary, unreasonable and capricious to find the Data Center Application incomplete for failure to provide additional information relating to the electrical infrastructure area.

587. Not only does the Planning Board and its professional fail to identify what additional information is needed, nothing in Section 175-71 requires any such additional information for purposes of determining completeness.

588. When additional information is requested, both Section 175-35.B and N.J.S.A. 40:55D-10.3 provides that the request for additional or supplemental information cannot be used to deem an application incomplete.

589. Finding an application incomplete for utilizing a scale of 1" = 150' where Section 175-71.A. requires the scale to be 1" = 100' is arbitrary, unreasonable and capricious because Section 175-71.A.(1) also states that "consideration shall be given to a smaller scale if it permits the total project to be clearly depicted on a standard sheet of the sizes permitted in the Map Filing Law."

590. The Map Filing Law, N.J.S.A. 46:26B-2(b)(1) provides that "[a] map shall show the scale, which shall be inches to feet and be large enough to contain legibly written data on the dimensions, bearings and all other details of the boundaries, and it shall also show the graphic scale."

591. The site plans provided contain legibly written data.

592. In addition, when the site plans for the Original Project were submitted, it utilized a 1" = 150' scale and were found to be acceptable.

593. Thus, any finding that a 1" = 150' scale is unacceptable is arbitrary, unreasonable

and capricious.

594. Finding that the Data Center Application was not complete because contours extending beyond 200' of the subject parcel were not shown is arbitrary, unreasonable and capricious.

595. Section 175-71.A.(3)(b) requires "Topographic contours from the United States Geological Survey quadrangle sheets may be submitted **in lieu of an actual field or aerial topographical survey, or the applicant may opt to furnish the same**. Contours shall extend 200 feet beyond the boundary of the proposal. …" (emphasis added).

596. Topographic contours were unnecessary because a Plan of Overall Boundy & Topographic Survey, prepared by Prism Engineering, dated April 7, 2026, consisting of nine (9) pages, was submitted with the Application for Amended Preliminary Site Plan.

597. The Planning Board also acted arbitrarily, capriciously and unreasonably in finding that the Data Center Application was incomplete because full architectural plans and views were not provided.

598. N.J.S.A. 40:55D-46(a) states, "[i]f any architectural plans are required to be submitted for site plan approval, the preliminary plans and elevations shall be sufficient."

599. The Applicant provided building elevations for all four elevations of the warehouse building and the data center building.

600. The Planning Board also acted arbitrarily, unreasonably and capriciously when it determined actual signatures were required on the plans submitted.

601. However, Section 175-71.A. requires that the site plan be submitted "in tentative form for discussion purposes…"

602. The word "tentative" is not defined in the Township Code; however, Section 175-10.A. requires words that are not defined to be given their standard meaning.

603. Dictionaries contain standard definitions for words and Merriam Websters online defines "tentative" as "not fully worked out or developed." See https://www.merriam-webster.com/dictionary/tentative.

604. An actual signature is only required once the plan is approved.

605. A signature block has been provided for the required signature once the plans are approved.

606. Finding the Data Center Application not complete because a stormwater maintenance schedule was not provided is arbitrary, unreasonable and capricious.

607. The Data Center Application is an amended application, which amends the application for the Original Project.

608. A maintenance schedule was previously provided as Appendix 10 in the original Stormwater Management Report dated December 1, 2023 and last revised July 14, 2025, prepared by Marathon Engineering & Environmental Services, Inc. See **Exhibit C-5**.

609. Number 17 of the Checklist attached to the Amended Application noted that the Stormwater Plan was previously submitted. See **Exhibit E-3**.

610. Hexa was entitled to rely upon the previously submitted maintenance schedule because it was submitting an amended application; therefore, no new maintenance schedule was required.

611. No formal checklist has been adopted by Ordinance.

612. The checklist provided by the Planning Board for use with site plan applications has not been adopted by Ordinance.

613. N.J.S.A. 40:55D-10.3 requires that checklists be adopted by Ordinance.

614. The Planning Board acted arbitrarily, unreasonably and capriciously when it required a new Certificate of Filing from the Pinelands.

615. On December 18, 2024, the Pinelands Commission issued the Applicant an Inconsistent Certificate of Filing for the Property.

616. This Certificate of Filing was previously submitted to the Board as part of the application for the Original Project and Number 11 of the Checklist attached to the Amended Application noted that the Certificate of Filing was previously submitted.

617. No new Certificate of Filing was required under the Pinelands Commission's regulations.

618. The Inconsistent Certificate of Filing was not specific for warehouse use and applied to the 522,000 s.f. commercial building and the 1,100,000 s.f. commercial building.

619. A change in non-residential use for the commercial building and the addition of the accessory structures for utility infrastructure did not constitute "development" under N.J.A.C. 7:50-4.1(a)(23) and N.J.A.C. 7:50-4.1(a)(8)(i) and it was arbitrary, unreasonable and capricious for the Planning Board refuse Hexa to rely upon the original Inconsistent Certificate of Filing for purposes of completeness.

620. The decision to ignore the existing Inconsistent Certificate of Filing was done intentionally and for the purpose of depriving Hexa of the protections afforded under N.J.S.A. 40:55D-10.5.

621. Preliminary site plan approval for the application for the Original Project was obtained on January 8, 2026, and the approval was memorialized in Resolution PB-10-26, adopted on February 2, 2026.

622. The Planning Board was required to provide the Pinelands Commission with notice of the grant of preliminary site plan approval within five (5) days following such grant or approval as required in N.J.A.C. 7:50-4.35(a) and N.J.A.C. 7:50-4.35(d).

623. In addition, the Planning Board is required to give notice to the Pinelands Commission of any "changes made to an application for development by an applicant subsequent to any local preliminary approval…" within five (5) days of receipt of the changes. N.J.A.C. 7:50-4.39(a).

624. This notice is required to include name of the applicant, the address of the property, the Certificate of Filing number, copies of the amended application, site plans and other documents, and a description of the changes. N.J.A.C. 7:50-4.37 and N.J.A.C. 7:50-4.38.

625. Importantly, the main difference between the Original Project and the Data Center Application is the change in use from warehouse to data center for one of the buildings.

626. The Pinelands Commission already approved data center use for the Property when it approved the 2025 Redevelopment Plan Authorizing Data Centers on the Property.

627. As an amended application, Hexa was entitled to rely upon the original Certificate of Filing.

628. In addition, Hexa has filed an appeal of the Pinelands Commission's determination that an amended Certificate of Filing is required.

629. Finally, it is arbitrary, unreasonable and capricious for the Planning Board to rely upon the May 11, 2026 letter from Artheon, which suggests that a use variance is needed because Section 175-127 of the Township Code states, "[i]n the Pinelands Area, no more than one principal use shall be located on a lot…"

630. Section 175-127 is not adopted as part of the Zoning Ordinance.

631. The Zoning Ordinance is contained solely in Article XIV of the Township Code. Section 175-127 is located in Article XIII, which sets forth design standards for site plan and subdivision approvals.

632. A (d)(1) use variance pursuant to N.J.S.A. 40:55D-70(d) is only allowed for variances to allow deviations from regulations adopted pursuant to Article 8 of the MLUL. Article 8 is the zoning power.

633. Because Article XIII was not adopted pursuant to the zoning power, deviations from the site plan and subdivision regulations are governed by N.J.S.A. 40:55D-51(b) which allows a planning board to grant exceptions from the requirements of site plan ordinances. As a result, at most, a waiver/exception would be required.

634. Failure of the Planning Board to consider any submission waivers was arbitrary, unreasonable and capricious.

635. The Planning Board had no factual or legal basis to find that the Data Center Application was not complete.

636. The Planning Board's finding that the Data Center Application was not complete is therefore arbitrary, unreasonable and capricious and is not valid.

## COUNT SEVENTEEN

## FAILURE TO TURN SQUARE CORNERS - 2026 REDEVELOPMENT PLAN BANNING DATA CENTERS ON THE PROPERTY

637. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

638. The Township and the Planning Board violated the square corners doctrine in adopting the 2026 Redevelopment Plan Banning Data Centers on the Property and in evaluating the consistency with the Master Plan.

639. The square corners doctrine originated with Justice Holmes in the 1920 case, Rock Island, A & L.R. Co. v. United States, 254 U.S. 131, 143 (1920), wherein he stated, "'[m]en must turn square corners when they deal with the Government[.]'" SSI Med. Servs., Inc. v. State, Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 284 N.J. Super. 184, 187 (App. Div. 1995), aff'd, 146 N.J. 614 (1996).

640. Several years later, the Courts observed, that "'[i]f we say with Mr. Justice Holmes, "Men must turn square corners when they deal with the Government", it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens.'" Gruber v. Mayor & Twp. Comm., 73 N.J. Super. 120, 127 (App. Div. 1962), quoting "Hobson's Choice and Similar Practices in Federal Taxation," 48 *Harv. L. Rev.* 1281, 1299 (1935).

641. Over time, this doctrine has become, "'[i]n dealing with the public, government must "turn square corners."'" SSI Med. Servs., Inc. v. State, Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 284 N.J. Super. 184, 187-188 (App. Div. 1995), aff'd, 146 N.J. 614 (1996).

642. The square corners doctrine is "our State's public policy jurisprudence [that] has expressly insisted that governmental agents and units of government observe certain standards and norms—particularly during litigation—that are beyond reproach." CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 585–586 (App. Div. 2010).

643. In addition, "'government has an overriding obligation to deal forthrightly and fairly with property owners[.]'" Citizens for Equity v. N.J. Dep't of Envtl. Prot., 126 N.J. 391, 397 (1991).

644. Bad faith is not required to establish a violation of the square corners doctrine. CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 586–

587 (App. Div. 2010).

645. Rather, it applies whenever a governmental entity tries to exploit an unfair advantage, such as:

a. Equitable considerations involving situations where there was substantial reliance on conduct of the governmental entity. Sellers v. Bd. of Trs. of the Police & Firemen's Ret. Sys., 399 N.J. Super. 51, 59 (App. Div. 2008).

b. Situations where a governmental entity seeks to exploit a litigational advantage or a tactical advantage. CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 586-87 (App. Div. 2010).

c. Situations involving contractual relationships. W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 561-62 (1989).

d. Situations where a governmental entity encourages an administrative proceeding that produces an advantage to the governmental entity. W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 561-62 (1989).

646. Under the square corners doctrine, a governmental entity's "'primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another.'" W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 561-62 (1989).

647. This is because, "'[m]en naturally trust in their government, and ought to do so, and they ought not to suffer for it[.]'" CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 587 (App. Div. 2010).

648. The square corners doctrine "'cannot be applied with rigidity or undue technicality'" and "'[is] always subject to the guiding principles of fundamental

fairness.'" Waterside Villas Holdings, LLC v. Monroe Tp., 434 N.J. Super. 275, 287 (App. Div. 2014).

649. The Court has explained, "'[i]t should go without saying that turning . . . square corners is minimally what citizens should be able to expect from their government[.]'" Musconetcong Watershed Ass'n v. N.J. Dep't of Envtl. Prot., 476 N.J. Super. 465, 483 (App. Div. 2023).

650. In a publication from the National Telecommunications and Information Administration, dated September 4, 2024, under Docket No.: "240823-0225", it reported that,

> Critical and emerging technologies like artificial intelligence (AI) have accelerated demands for more computing infrastructure. Powering these transformative technologies are data centers - facilities that house computing machines and related hardware components that process, store, and transmit large amounts of data - and the telecommunication infrastructure enabling information processing.
> Data centers are important enablers for economic growth and technological development. Their capabilities for data processing, ubiquitous connectivity, secure storage, cost-efficiency, and economy-wide job creation, among others, yield substantial benefits.

See https://www.ntia.gov/federal-register-notice/2024/request-comments-bolstering-data-center-growth-resilience-and-security, last visited 5/18/2026.

651. In a publication dated February 5, 2026, from the Congressional Research Service it stated,

> The U.S. government has increasingly focused on policy directions to support building a robust, domestic AI infrastructure. For example, President Biden issued Executive Order (E.O.) 14141, "Advancing United States Leadership in Artificial Intelligence Infrastructure," on January 14, 2025, providing a federal plan to build AI infrastructure in the United States. On January 21, 2025, President Trump announced a private joint venture with potential investment of up to $500 billion to fund AI infrastructure, including plans to build up to 20 data centers in the country. The National Telecommunications and Information Administration (NTIA), a Department of Commerce agency serving as the President's principal advisor on telecommunication and information policies, issued a request for comments (RFC) to inform policymaking for "sustainable, resilient and secure" growth of data centers to power critical and emerging technologies, including AI. The RFC

> received 58 comments, ranging from the importance of allocating an estimated $175 billion of potential funds to U.S.-backed global AI infrastructure projects to challenges faced by domestic data centers, such as regulatory obstacles for siting new facilities and access to energy, supply chains, and operational workforce.

See https://www.congress.gov/crs-product/IF12899, last visited 5/18/2026.

652. The publication also noted that data centers were critical infrastructure, stating,

> AI infrastructure, including data centers, cloud computing services, and energy resources, is vital for AI development and operation. The criticality of such infrastructure raises policy issues such as data security, infrastructure access and security, energy reliability and efficiency, and costs of building such infrastructure, all of which implicate national security interests.

See https://www.congress.gov/crs-product/IF12899, last visited 5/18/2026.

653. Executive Order (E.O.) 14141, issued by President Biden on January 14, 2025 stated under Section 2 "Policy" that "It is the policy of the United States to enable the development and operation of AI infrastructure, including data centers, in the United States in accordance with five guiding principles." See https://www.presidency.ucsb.edu/documents/executive-order-14141-advancing-united-states-leadership-artificial-intelligence, last visited 5/18/2026.

654. In furtherance of these policies to encourage data centers as critical infrastructure, originally the Township of Monroe allowed data centers as permitted uses and had appropriate standards prepared to regulate data centers in accordance with the policy of the United States.

655. Even though the Township had prepared standards to address the impacts of data centers on the community as set forth in Ordinance O:19-2026, the draft ordinance setting forth regulations for data centers, and had limited data center use to a property that the Planning Board Planner previously opined was the perfect spot for this use, instead of introducing Ordinance O:19-2026, the Township caved into public pressure to find a work around to prohibit data centers altogether.

656. At the March 11, 2026 Township Council meeting, a member of the public acknowledged that "I know you did your best to come up with standards and everything…" but instead of requesting revisions to the standards, she requested that the Township use its authority to circumvent their legal authority and to find a way to prevent data centers:

> You have a chance, because of your positions, to try to figure out a way around whatever this is…you are saying that there is a legal responsibility for you, whatever, there's ways around it…. That is what larger government does. They find ways around things. This is your chance to find a way around this and a way out of this for us. That's what we want you to do.

657. It was acknowledged at the March 11, 2026 meeting that "the faster we get restrictions in, the faster we have more protections" and by tabling the draft Ordinance O:19-2026 it allowed the Township to come up with additional regulations for data centers.

658. The member of the public further alleged that the Owner and Hexa do not have rights and that the Township should be allowed to ban data centers and if there is a law that allows data centers to be built, the Township has to fight that law.

659. The member of the public further stated, "whatever you guys can scheme up to try to get around this, to write new legislation, to push something through, we will follow you on it" and reiterated that they do not want data centers.

660. A member of the public from the Pinelands Alliance then told the Township Council he had a "clear path forward" and suggested that the Township repeal the redevelopment plan.

661. Instead of regulating the data center use, which would address the concerns of the residents while still protecting the rights of the public at large and the Owner and Hexa in particular, the Township opted to exploit a tactical advantage to harm the Owner and Hexa and prevent a data center at the Property.

662. The Township took this recommendation to prevent data centers to heart and decided to create a tactical and legal advantage to the detriment of Hexa and the Owner, and to egregiously deprive Hexa and the Owner of its constitutionally protected property rights.

663. At the March 25, 2026 Township Council meeting, the Township Council introduced the 2026 Redevelopment Plan Banning Data Centers on the Property, which removed data centers from the Redevelopment Plan and in doing so, a member of the Township Council stated, "I can assure you and I think Council will all agree with this, that it's not gonna happen. Um, we are here as elected officials, uh, this evening saying that we're going to do everything in our power to stop all data centers from coming here."

664. In addition, the Mayor stated, "[e]ven if we create an ordinance to ban them, they still under the Municipal Land Use Laws have a right to apply for a variance, um, to our land use boards and they have a right to make arguments and have their due process why they should be permitted. But again, we're going to encourage those boards to flat-out deny them. Our professionals are instructed to guide them to, uh, deny them knowing, again, our position. Our hope is that we never receive any application for a data center, but if we do, it will be denied."

665. It violates fundamental fairness and the square corners doctrine to enact zoning laws that extend beyond the public need.

666. """But it is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority shall not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities…"'" Gruber v. Mayor & Twp. Comm., 73 N.J. Super. 120, 131 (App. Div. 1962).

667. The public need was solely to regulate data centers to protect the public and an outright ban was completely unnecessary and violates the square corners doctrine.

668. The Township was obligated to treat the Owner and Hexa fairly and with the same dignity as other property owners in the Township.

669. The Township's decision to switch gears and totally prohibit data centers, which is less intense than the preliminarily approved warehouse use, is completely arbitrary and violates the square corners doctrine.

670. Under N.J.A.C. 7:50-3.32 of the Pinelands Comprehensive Management Plans, all land use ordinances are required to be submitted to the Pineland Commission for review and approval.

671. After Hexa filed the Data Center Application on April 8, 2026, the Township submitted drafts of the 2026 Redevelopment Plan Banning Data Centers and the Ordinance Banning Data Centers Town-Wide to the Pinelands on April 14, 2026. See **Exhibit X**.

672. On April 17, 2026, Hexa's Engineer notified the Pinelands that it had filed an amended application with the Planning Board and submitted those plans to the Planning Board. See **Exhibit CC, p.2**.

673. Thereafter, the Township Engineer emailed a planner at the Pinelands on April 22, 2026, in order to speed up the review process for the draft Ordinances.

674. Upon information and belief, the Township Engineer or other representatives of the Township called and/or met with the Pinelands to discuss how to block Hexa's application.

675. At 9:16 a.m. on April 23, 2026, the day after the 2026 Redevelopment Plan Banning Data Centers and the Ordinance Banning Data Centers Town-Wide were adopted, the Pinelands again emailed the Township Engineer to see if the ordinances had been adopted. See **Exhibit BB**.

676. At 12:58 p.m., the Township Engineer emailed the adopted 2026 Redevelopment Plan Banning Data Centers and the Ordinance Banning Data Centers Town-Wide to the Pinelands. See **Exhibit AA**.

677. At 1:41 p.m., a representative of the Pinelands told Hexa's Engineer that an "Amended Certificate of Filing is required" for the Data Center Application. See **Exhibit CC**.

678. Less than an hour after the 2026 Redevelopment Plan Banning Data Centers and the Ordinance Banning Data Centers Town-Wide was submitted to the Pinelands and about 12 minutes after the Pinelands advised that an Amended Application was required, the Pinelands issued the letter approving the 2026 Redevelopment Plan Banning Data Centers and the Ordinance Banning Data Centers Town-Wide. See **Exhibit DD**.

679. The Pinelands Commission and the Township conspired and coordinated efforts to expedite the review and Pinelands' approval of the 2026 Redevelopment Plan Banning Data Centers and the Ordinance Banning Data Centers Town-Wide, and to demand a new Certificate of Filing from the Pinelands in order to prevent Hexa and the Owner from being able to utilize the Time of Application Rule under N.J.S.A. 40:55D-10.5.

680. This was done solely to gain a litigation advantage so that the Township could deny the data center use.

681. The Township's actions in adoption of the 2026 Redevelopment Plan Banning Data Centers on the Property instead of draft Ordinance O:19-2026, which established standards to regulate data centers, violates the square corners doctrine.

682. The 2026 Redevelopment Plan Banning Data Centers on the Property is invalid and unenforceable.

## COUNT EIGHTEEN

## FAILURE TO TURN SQUARE CORNERS - ORDINANCE BANNING DATA CENTERS TOWN-WIDE

683. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

684. The Township and the Planning Board violated the square corners doctrine in adopting the Ordinance Banning Data Centers Town-Wide and in evaluating its consistency with the Master Plan.

685. Under the square corners doctrine, the Township and the Planning Board were required to deal fairly and forthrightly with property owners. Citizens for Equity v. N.J. Dep't of Envtl. Prot., 126 N.J. 391, 397 (1991).

686. Neither the Planning Board nor the Township were entitled to exploit a litigational or tactical advantage, CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 586-87 (App. Div. 2010), or to encourage an administrative proceeding producing an unfair advantage to the Township, W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 561-62 (1989).

687. Even though the Township had prepared standards to address the impacts of data centers on the community, the Township caved into public pressure to find a work around to prohibit data centers altogether.

688. At the request of members of the public, instead of regulating the data center use, which would address the concerns of the residents while still protecting the rights of the public at large and allowing appropriate locations for a data center use that would benefit the entire community, the Township opted to exploit a tactical advantage to harm the Owner and Hexa and other property owners within the Township.

689. It violates fundamental fairness and the square corners doctrine to enact zoning laws that extend beyond the public need.

690. The public need was solely to regulate data centers to protect the public and an outright ban was completely unnecessary and violates the square corners doctrine.

691. The Township's decision to enact an outright ban, and to recommend to its professionals and the Planning Board that they take any action necessary to prevent the siting of a data center in the Township and deny any application for the same is completely arbitrary and violates the square corners doctrine.

692. The Ordinance Banning Data Centers Town-Wide violates the square corners doctrine and is therefore invalid and unenforceable.

## COUNT NINETEEN

## FAILURE TO TURN SQUARE CORNERS – COMPLETENESS DETERMINATION

693. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

694. The Planning Board violated the square corners doctrine in finding the Data Center Application not complete.

695. Under the square corners doctrine, the Township and the Planning Board are required to deal fairly and forthrightly with property owners. Citizens for Equity v. N.J. Dep't of Envtl. Prot., 126 N.J. 391, 397 (1991).

696. Neither the Planning Board nor the Township were entitled to exploit a litigational or tactical advantage, CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 586-87 (App. Div. 2010), or to encourage an administrative proceeding producing an unfair advantage to the Township, W.V. Pangborne & Co. v. N.J. Dep't of Transp.,

116 N.J. 543, 561-62 (1989).

697. The Planning Board attempted to exploit a tactical advantage in making its determination that the Data Center was not complete by utilizing an entirely different standard for determining completeness than it used for determining completeness in the application for the Original Project.

698. The Planning Board attempted to exploit a tactical advantage when it refused to recognized that the Data Center Application was an amended application and Hexa was entitled to rely upon documents previously submitted with the application for the Original Project.

699. The Planning Board attempted to exploit a tactical advantage when it refused to consider or grant any submission waivers for the Data Center Application.

700. The Township violated the Square Corners Doctrine when the Mayor stated that the Township intended to ban all data centers and the Township was going to direct the Planning Board and all of its officials to "deny any applications for that use" and to "block any data centers from coming until we can get an ordinance in place."

701. The Planning Board violated the Square Corners Doctrine when it found that the Data Center Application was not complete.

702. Had the Planning Board applied the correct standard for determining completeness for the Data Center Application, the Planning Board would have been required to find the Data Center Application Complete.

703. The Planning Board and the Township conspired and coordinated efforts to deem the Data Center Warehouse amended application "not complete" in order to prevent Hexa and the Owner from being able to utilize the Time of Application Rule under N.J.S.A. 40:55D-10.5.

704. The Planning Board, at the request of the Township attempted to exploit a litigation advantage in attempt to avoid the time of application rule.

705. The Township and the Planning Board violated the Square Corners Doctrine.

**COUNT TWENTY**

**FAILURE TO PROVIDE NOTICE – ORDINANCE BANNING DATA CENTERS TOWN-WIDE**

706. Plaintiff repeats the allegations set forth in the proceeding paragraphs as if fully set forth herein and incorporates the same herein by reference.

707. N.J.S.A. 40:55D-15(a) requires that notice "by personal service, certified mail, or email with confirmation that the email was delivered, shall be made to the clerk of adjoining municipality of all hearings on the adoption, revision or amendment of a development regulation involving property situated within 200 feet of such adjoining municipality at least 10 days prior to the date of such hearing."

708. N.J.S.A. 40:55D-15(b) requires that notice "by personal service, certified mail, or email with confirmation that the email was delivered, shall be made to the county planning board" for all hearings regarding the adoption, revision or amendment of any development regulations at least 10 days before the hearing.

709. N.J.S.A. 40:55D-62.1 requires that notice must be given for amendments to zoning ordinances "proposing a change to the classification or boundaries of a zoning district" but excluding changes made pursuant to recommendations in a periodic general reexamination of the master plan, to all property owners within the district to be affected by the change by personal service or certified mail.

710. N.J.S.A. 40:55D-62.1 also requires that notice of changes to the zoning classification or boundaries of a zoning district, excluding changes made pursuant to

recommendations in a periodic general reexamination of the master plan, be given to the Office of Planning Advocacy by personal service or certified mail.

711. A change to the uses permitted within a zoning district, including conditional uses constitutes a change to the zoning classification.

712. The Appellate Division has said,

> This examination of the MLUL confirms that in its most general sense, classification refers to the use permitted in a zoning district, such as residential, commercial or industrial, as well as sub-categories within the broader uses, such as single-family residential and high-density residential, highway commercial and neighborhood commercial, and highway retail and neighborhood retail. We also encounter uses that may be permitted under certain conditions within a generally designated category. A change in any of these broad categories and sub-categories has the capacity to fundamentally alter the character of a zoning district.

Robert James Pacilli Homes, L.L.C. v. Twp. of Woolwich, 394 N.J. Super. 319, 330-31 (App. Div. 2007).

713. Page 50 of the Municipal Master Plan indicates that industrial uses belong in industrial zones, especially ones that have potential negative impacts on neighbors, stating, "[i]ndustrial zones may be best suited for those uses which cause harm or negatively impact neighbors…"

714. It further noted on page 50 that "more modern industrial uses (technology, etc.) are permitted in a variety of zones."

715. Data centers are a modern industrial use which the Planning Board Planner believed are permitted as part of industrial warehouse uses in numerous zones.

716. Wholesale distribution and warehouse facilities are conditional uses within the following zones: (a) within the Rural development zoning districts pursuant to Section 175-160.D.(2)(4); (b) within the RG-C Regional Growth Commercial District pursuant to Section 175-161.6.A(2)(d); (c) within the RD-C Rural Development Commercial District pursuant to Section

175-163.0.A(2)(e); and (d) within the C Commercial District pursuant to Section 175-163.D(1)(c)[2].

717. Wholesale distribution and warehouse facilities are permitted uses in the PB Planned Business District pursuant to Section 175-163.G.(2).

718. Light industrial uses, which include storage uses are permitted within Monroe Township as follows: (a) RG-LI Regional Growth Light Industrial District; (b) PB Non-Residential Zone pursuant to Section 175-163.G.(2); and (c) within the RD-C Rural Development Commercial District pursuant to Section 175-163.0.A(2)(b).

719. Because the Ordinance Banning Data Centers Town-Wide changes the types of uses permitted in these zones, it constitutes a zoning classification change and required notice.

720. In addition, the Ordinance Banning Data Centers Town-Wide also changes the accessory uses that are permitted in every zone, and would fundamentally change the character of all zones.

721. For example, a "home occupation" is any "occupation or activity carried out for gain by a resident and conducted as a customary, incidental and accessory use in the principal residential use on the lot. In no case shall residents conducting office-type work from home be considered a home occupation."

722. Pursuant to Section 175-111 of the Township Code, home occupations are permitted as accessory uses "within any residential use in the Township, within any Zone."

723. Likewise, a "home professional use" is permitted as an accessory use in every residential zone pursuant to Section 175-112.

724. A home professional office includes any office for any professional person. See Section 175-112.A.

725. A data center is broadly defined to include any "facility" which "houses computer and network systems" including "servers, network equipment and appliances, telecommunications and data storage systems, systems for monitoring and managing infrastructure performance, Internet-related equipment and services, data communications connections, environmental controls, fire protection systems, and security systems and services."

726. An accessory server room is limited to the lesser of 2% of the gross floor area of a principal structure or two thousand (2,000) square feet.

727. This limitation could essentially prohibit home occupations and home professional uses in apartment complexes because collectively, the computer and server rooms for each apartment could exceed the maximum size.

728. Likewise, home occupations and home professional uses in small houses could be prohibited due to the size limitations.

729. Such a change could fundamentally change the character of residential districts within Monroe Township.

730. Likewise, in an office building, there may be multiple offices, each of which has a need for its own dedicated server room.

731. If an office is small, say 500 s.f. or less, the dedicated server room could be no bigger than 10 s.f., which would be smaller than a closet, but depending upon the type of work that the office is performing, may be insufficient to meet their needs.

732. In addition, in a large office building, where there are multiple offices, if one office's server room is large due to their needs, and the 2% limit is based on the square footage of the entire structure, the one large office space user could consume all of the dedicated server room space, leaving none for the other office users.

733. The Ordinance Banning Data Centers Town-Wide has the impact of banning uses that rely upon computing and server usage in excess of the limitation on Accessory Server Rooms.

734. Such a change could fundamentally change the character of commercial districts within Monroe Township.

735. Since the Ordinance Banning Data Centers Town-Wide impacts all property within Monroe Township, all municipalities bordering Monroe Township should have received notice.

736. Upon information and belief, the Township did not provide notice of the public hearing on the Ordinance Banning Data Centers Town-Wide to the clerks of adjoining municipality as required under the MLUL.

737. Upon information and belief, the Township did not provide notice of the public hearing on the Ordinance Banning Data Centers Town-Wide to the Office of Planning Advocacy as required by the MLUL.

738. Upon information and belief, the Township did not provide notice of the public hearing on the Ordinance Banning Data Centers Town-Wide to Gloucester County as required by the MLUL.

739. Upon information and belief, the Township did not provide notice of the public hearing on the Ordinance Banning Data Centers Town-Wide to the property owners affected by the Ordinance Banning Data Centers Town-Wide as required by the MLUL.

740. The Township did not provide notice to Hexa or the Owner of the Property who was affected by the Ordinance Banning Data Centers Town-Wide as required by the MLUL.

741. Failure to comply with the notice requirements under the MLUL render the Ordinance Banning Data Centers Town-Wide void.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that judgment be rendered and an order be entered as follows:

A. Finding and declaring that the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) is arbitrary, unreasonable and capricious and invalid;

B. Finding and declaring that the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) is unconstitutional as applied to Plaintiff and the Property;

C. Finding and declaring and declaring that the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) is unconstitutional on its face;

D. Finding and declaring the Township violated the square corners doctrine in adopting the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026);

E. Finding and declaring the Township violated 42 U.S.C. 1983 in adopting the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026);

F. Finding and declaring the Township violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 in adopting the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026);

G. A declaration that the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) is void, invalid and not enforceable;

H. Finding and declaring that the Township violated N.J.S.A. 40:55D-62 of the Municipal Land Use Law;

I. Finding and declaring that the Township violated N.J.S.A. 40:55D-70(d) of the Municipal Land Use Law;

J. Finding and declaring the Township failed to comply with the notice requirements under the Municipal Land Use Law;

K. Finding and declaring that the Planning Board violated N.J.S.A. 40:55D-10.5 of the Municipal Land Use Law;

L. Finding and declaring that the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) is arbitrary, unreasonable and capricious and invalid;

M. Finding and declaring that the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) is unconstitutional as applied to Plaintiff and the Property;

N. Finding and declaring at the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) is unconstitutional on its face;

O. Finding and declaring the Township violated the square corners doctrine in adopting the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026);

P. Finding and declaring that the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) is void for failing to comply with the notice requirements under the Municipal Land Use Law;

Q. Finding and declaring that the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) violated the provisions of the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq.;

R. Finding and declaring the Township violated 42 U.S.C. 1983 in adopting the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026);

S. Finding and declaring the Township violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 in adopting the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026);

T. A declaration that the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026) is void, invalid and not enforceable;

U. Finding and declaring the Planning Board's actions in declaring the Data Center Application as not complete is arbitrary, unreasonable and capricious and invalid;

V. A declaration that Planning Board's actions in declaring the Data Center Application as not complete is unconstitutional as applied to Plaintiff and the Property;

W. Finding and declaring that the Planning Board violated the square corners doctrine in declaring the Data Center Application as not complete;

X. Finding and declaring that the Planning Board's decision to utilize Section 175-61 as the standard for determining completeness was ultra vires and void;

Y. Finding and declaring that the Planning Board that the Planning Board violated Section 175-37.D. of the Township Code;

Z. Finding and declaring that Planning Board's actions declaring the Data Center Application as not complete violated the provisions of the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq.;

AA. Finding and declaring the Planning Board violated 42 U.S.C. 1983 in in declaring the Data Center Application as not complete;

BB. Finding and declaring the Planning Board violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 in declaring the Data Center Application as not complete;

CC. A declaration that Planning Board's actions in declaring the Data Center Application as not complete is void, invalid and must be overturned;

DD. A declaration that the Data Center Application is deemed complete;

EE. A declaration that the Data Center Application is entitled to protection under the

Time of Application Rule;

FF. Finding and declaring that the Township and the Planning Board violated the New Jersey Constitution;

GG. Finding and declaring that the Township and the Planning Board violated the U.S. Constitution;

HH. Declaring the Township and the Planning Board are liable to Plaintiff for violation of 42 U.S.C. 1983;

II. Declaring the Township and the Planning Board are liable to Plaintiff for violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2;

JJ. Awarding injunctive relief to Plaintiff barring the Township from enforcing the 2026 Redevelopment Plan Banning Data Centers on the Property (Ordinance O:20-2026) and the Ordinance Banning Data Centers Town-Wide (Ordinance O:25-2026);

KK. Awarding injunctive relief to Plaintiff requiring the Planning Board to declare the Data Center Application complete;

LL. Awarding mandatory injunctive relief to Plaintiff mandating that the Planning Board declare the Data Center Application Complete and proceed with hearing the Data Center Application in accordance with the time of application rule;

MM. Awarding damages to Plaintiff for the loss of the use of the Property as a data center, which such damages are in excess of $300,000,000;

NN. Awarding Plaintiff reasonable attorney's fees, costs of suit; and

OO. Granting such other relief as the Court deems just and equitable.

**MALEY GIVENS, P.C.**
Attorney for Plaintiffs

Dated: September 17, 2026 By: /s/ M. James Maley Jr.
M. JAMES MALEY, JR.*
Emily K. Givens
Erin E. Simone
1150 Haddon Avenue, Suite 210
Collingswood, NJ 08108
(856) 854-1515
jmaley@maleygivens.com
egivens@maleygivens.com
esimone@maleygivens.com

**CERTIFICATION PURSUANT TO RULE CIV. PRO. 11**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Amended Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Amended Complaint otherwise complies with the requirements of Rule 11.

**MALEY GIVENS, P.C.**
Attorney for Plaintiffs

Dated: September 17, 2026 By: /s/ M. James Maley Jr.
M. JAMES MALEY, JR.*
Emily K. Givens
Erin E. Simone
1150 Haddon Avenue, Suite 210
Collingswood, NJ 08108
(856) 854-1515

jmaley@maleygivens.com
egivens@maleygivens.com
esimone@maleygivens.com

**DESIGNATION OF TRIAL COUNSEL**

M. James Maley, Jr., Esq. is hereby designated as trial counsel on behalf of Plaintiff.

**MALEY GIVENS, P.C.**
Attorney for Plaintiffs

Dated: September 17, 2026 By: /s/ M. James Maley Jr.

M. JAMES MALEY, JR.*
Emily K. Givens
Erin E. Simone
1150 Haddon Avenue, Suite 210
Collingswood, NJ 08108
(856) 854-1515
jmaley@maleygivens.com
egivens@maleygivens.com
esimone@maleygivens.com

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues within this Complaint.

**MALEY GIVENS, P.C.**
Attorney for Plaintiffs

Dated: September 17, 2026 By: /s/ M. James Maley Jr.

M. JAMES MALEY, JR.*
Emily K. Givens
Erin E. Simone
1150 Haddon Avenue, Suite 210
Collingswood, NJ 08108
(856) 854-1515
jmaley@maleygivens.com
egivens@maleygivens.com
esimone@maleygivens.com